950 F.2d 1401
 57 Empl. Prac. Dec. P 41,114, 60 USLW 2436
 ASSOCIATED GENERAL CONTRACTORS OF CALIFORNIA, INC., a
nonprofit California corporation, Plaintiff-Appellant,
v.
COALITION FOR ECONOMIC EQUITY, et al.,
Defendants-Intervenors-Appellees.
City and County of San Francisco, Defendants-Appellees.
 No. 90-16582.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 15, 1991.
Decided Dec. 6, 1991.
 
 John H. Findley, Pacific Legal Foundation, Sacramento, Cal., for plaintiff-appellant.
 William C. McNeill, III, Employment Law Center, San Francisco, Cal., for intervenors-appellees.
 Mara E. Rosales, Deputy City Atty., San Francisco, Cal., for defendants-appellees.
 Theodore Hsien Wang, San Francisco Lawyers' Committee for Urban Affairs; Judith Kurtz, Equal Rights Advocates, San Francisco, Cal.; and Esteban Lizardo, Mexican-American Legal Defense and Educational Fund, Los Angeles, Cal., for defendants.
 Appeal from the United States District Court for the Northern District of California.
 Before FLETCHER, THOMPSON and O'SCANNLAIN, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 We confront once again the tension between the efforts of the City and County of San Francisco ("the City") to ameliorate the effects of past discrimination in City contracting processes on disadvantaged groups and the constraints imposed by the Fourteenth Amendment's guarantee of equal treatment to all citizens, as well as other provisions of state and federal law. Appellant, Associated General Contractors of California, Inc. ("AGCC"), appeals the district court's denial of its motion for a preliminary injunction enjoining the enforcement of San Francisco's Minority/Woman/Local Business Utilization Ordinance--II, No. 175-89 ("1989 Ordinance") insofar as it applies to prime construction contracts. 748 F.Supp. 1443. We affirm.
 
 FACTS
 
 2
 The challenge to San Francisco's use of racial and gender preferences to remedy discrimination in city contracting dates back more than seven years. In April 1984, the San Francisco Board of Supervisors (the "Board") passed the Minority/Women/Local Business Utilization Ordinance, No. 139-84 ("1984 Ordinance"), which required the City to set aside designated percentages of its contracting dollars to minority-owned business enterprises ("MBEs") and women-owned business enterprises ("WBEs"). In addition, the 1984 Ordinance required that MBEs, WBEs and locall-owned business enterprises ("LBEs") receive a five percent bidding preference to be taken into account when the City calculated the low bid on city contracts.
 
 
 3
 AGCC, an organization of contractors engaged in the building and construction industry, which has a substantial number of members who are not within the classes granted preferences by the 1984 Ordinance, challenged the implementation of the 1984 Ordinance in court. In reviewing the ordinance, this circuit upheld the provisions favoring WBEs and LBEs against AGCC's constitutional challenge but invalidated the provisions favoring MBEs. AGCC v. City and County of San Francisco, 813 F.2d 922, 928-44 (9th Cir.1987), petition dismissed, 493 U.S. 928, 110 S.Ct. 296, 107 L.Ed.2d 276 (1989) (AGCC I ). In addition, we ruled that all bidding preferences, insofar as they applied to contracts over $50,000, violated San Francisco City Charter section 7.200, which required that contracts over $50,000 be given to the "lowest reliable and responsible bidder." Id. at 927-928.
 
 
 4
 Shortly after our decision in AGCC I, the Supreme Court considered a similar minority set-aside plan in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In that decision, a deeply divided Supreme Court struck down the racial set-aside plan adopted by the city of Richmond, Virginia.[1] At the same time, however, the Court confirmed that municipalities could employ race-conscious remedies to redress discrimination in certain circumstances. Id. at 509, 109 S.Ct. at 729 (Rehnquist, C.J., O'Connor, J., White, J., Kennedy, J.); Id. at 511, 109 S.Ct. at 730 (Stevens, J.); Id. at 528, 109 S.Ct. at 739 (Marshall, J., Brennan, J., Blackmun, J.). Prior to Croson, the City had been investigating continued discrimination in city contracting. In that capacity, it had received, among other information, testimony from 42 witnesses, and written submittals from 127 minority, women, local, and other business representatives. Subsequently, in an attempt to determine whether Croson's criteria for permitting race-conscious ordinances were met with respect to San Francisco, the City held an additional ten public hearings, commissioned two statistical studies, and sought written submissions from the public. Out of this process emerged the 1989 Ordinance now before this court. It became effective on July 1, 1989 and may be cited as SF Admin.Code, Ch. 12D.
 
 
 5
 Rather than providing the set-asides mandated by the 1984 Ordinance, the 1989 Ordinance gives bid preferences to prime contractors who are members of groups found disadvantaged by previous bidding practices. Specifically, the Ordinance provides a five percent bid preference for LBEs, WBEs, and MBEs. Because the WBE and MBE preferences are treated cumulatively with the LBE preferences under the ordinance, local MBEs and WBEs become eligible for a ten percent total bid preference, representing the cumulative total of the five percent preference given LBEs and the 5% preference given MBEs and WBEs. § 12D.8(B)(2). The Ordinance defines "MBE" as an economically disadvantaged business that is owned and controlled by one or more minority persons. § 12D.5. "Minority" is defined to include Asians, Blacks, and Latinos. "WBE" is defined as an economically disadvantaged business that is owned and controlled by one or more women. "Economically disadvantaged", insofar as the term applies to public works construction contracts, is defined as a business whose average gross annual receipts in the three fiscal years immediately preceding its application for certification as a MBE do not exceed fourteen million dollars. The Ordinance allows non-MBEs and non-WBEs to benefit from the bid preferences given these groups by extending a five percent preference to those who engage in a joint venture with a local MBE or WBE provided the MBE's or WBE's participation is between 35% and 51%. § 12D.8(B)(2). Those who engage in a joint venture with a local MBE or WBE whose participation is 51% or more, receive a ten percent preference. Id. A waiver of the bid preference is provided where no MBE or WBE is available to provide the necessary goods or services. § 12D.13.
 
 
 6
 Subsequent to the passage of the 1989 Ordinance, the Board enacted Ordinance No. 424-89, which raised the threshold for competitive bidding for city contracts previously set at $50,000 by section 7.200 of the San Francisco City Charter, to $10,000,000 ("the competitive bidding threshold ordinance"). Ordinance No. 424-89 was enacted pursuant to an amendment to the city charter passed the prior year, by which the electorate authorized the Board of Supervisors to increase or decrease the competitive bidding threshold. After the implementation of the new bid threshold ordinance, contracts valued at over $10,000,000 would still be subject to the city charter's "lowest reliable and responsible bidder" requirement. Contracts below that level presumably would be subject to the new bid preference system.
 
 
 7
 Soon after the effective dates of the 1989 Ordinance and the competitive bidding threshold ordinance, AGCC filed this action and sought a preliminary injunction. The motion for preliminary injunction challenges both the constitutionality of the MBE provisions of the 1989 Ordinance insofar as they pertain to public works construction contracts and the validity under state law of the competitive bidding threshold ordinance.[2] In a well-reasoned opinion, the district court denied the motion for preliminary injunction. Although the district court held that the alleged violation of the constitutional rights of AGCC's members would, if meritorious, produce irreparable injury, it found that plaintiffs were unlikely to prevail on their constitutional claim. It rejected AGCC's charter claim based on its finding that AGCC had failed to demonstrate the requisite possibility of irreparable injury. AGCC now appeals the district court's denial of its motion for preliminary injunction to this court.
 
 DISCUSSION
 
 8
 Because the grant or denial of a preliminary injunction lies within the discretion of the district court, our review of the denial of a preliminary injunction is limited. Johnson Controls, Inc. v. Phoenix Control Sys., 886 F.2d 1173, 1174 (9th Cir.1989); Big Country Foods, Inc. v. Board of Educ., 868 F.2d 1085, 1087 (9th Cir.1989). We will reverse the denial of a preliminary injunction only if the district court abused its discretion or relied on an erroneous legal premise or clearly erroneous findings of fact. Johnson Controls, 886 F.2d at 1174; Sports Form, Inc. v. United Press Int'l, Inc., 686 F.2d 750, 752 (9th Cir.1982). We review de novo the correctness of the legal standards employed by the district court in evaluating the plaintiff's likelihood of success on the merits.
 
 I. AGCC's STANDING TO PURSUE THIS ACTION
 
 9
 As an initial matter, Appellees-Intervenors The Coalition for Economic Equity, et al. ("Intervenors"), argue that this case fails to present a case or controversy for Article III purposes because AGCC lacks standing to sue on behalf of its members. This issue was not raised below. However, because a "threshold question in every federal case" is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III," Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), this issue must be resolved before we may review the district court's denial of the motion for preliminary injunction. See also Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969) (opinion of Marshall, J.) (standing issue governs appellate jurisdiction as well as trial court jurisdiction).
 
 
 10
 In order for an organization to have representational standing to sue on behalf of its members, it must meet the three-pronged test set out by the Supreme Court in Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).[3] The organization must establish that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 343, 97 S.Ct. at 2441. The second prong of the test is not at issue here; the interest of AGCC in preserving favorable conditions for bidding by its members is clearly germane to the organization's purpose. See Complaint at p 3 ("AGCC exists for the purpose, among others, of fostering, promoting, and protecting the common interests of its member contractors and subcontractors in the construction industry in California."). However, the first and third prongs of the test raise issues that we must now resolve.
 
 
 11
 The Intervenors argue that no AGCC member would have standing individually to bring these claims because no member has asserted a sufficient risk of injury. The Intervenors point out that the record evidence indicating that any of AGCC's members will suffer injury stemming from the 1989 Ordinance is limited to a declaration from one AGCC member stating that the ordinance has discouraged him from bidding on San Francisco contracts and AGCC's more general assertions that the ordinance could cause its members to lose contracts for which they are bidding.[4] The Intervenors contend that such assertions are insufficient to confer standing upon any of AGCC's members, and therefore upon AGCC.
 
 
 12
 It has long been "established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action...." Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937). This requirement is necessary to ensure that federal courts reserve their judicial power for " 'concrete legal issues, presented in actual cases, not abstractions.' " United Public Workers v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (quoting Electric Bond & Share Co. v. Securities & Exchange Comm'n, 303 U.S. 419, 443, 58 S.Ct. 678, 687, 82 L.Ed. 936 (1938)). To meet this requirement, "[a] hypothetical threat is not enough." United Pub. Workers, 330 U.S. at 90.
 
 
 13
 A long line of Supreme Court cases delineate the type of injury or risk of injury deemed so remote or hypothetical as to be insufficient to confer standing. In Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), for example, the Supreme Court held that no case or controversy existed on respondent's challenge to the Department of the Army's program involving surveillance of civilian political activities. Respondents in that case admitted that there was no indication that the Army had the respondents' political activities under surveillance or that it contemplated such surveillance in the foreseeable future; they claimed, however, that the knowledge that the Army might do so "chilled" their political expression. The Court noted that, while it had previously found a case or controversy to exist merely from the chilling effect of governmental regulations,
 
 
 14
 [i]n none of these cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.
 
 
 15
 . . . . .
 
 
 16
 The respondents do not meet this test; their claim, simply stated is that ... the very existence of the Army's data-gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights.... Allegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm....
 
 
 17
 Id. at 11, 13-14, 92 S.Ct. at 2324-25, 2325-26 (emphasis in original). Similarly, in United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), the Supreme Court found no case or controversy presented where plaintiffs sought an injunction to prohibit the government from enforcing the Hatch Act's bar on political activity by government employees, 18 U.S.C. § 61h, but had neither yet violated the act by participating in political activity nor asserted firm plans to do so in the future. Id. at 86-91, 67 S.Ct. at 562-65; see also, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 101-05, 103 S.Ct. 1660, 1664-67, 75 L.Ed.2d 675 (1983) (plaintiff previously subjected to police stranglehold lacked standing to seek injunctive relief because no showing that he was likely to be exposed to future police brutality); O'Shea v. Littleton, 414 U.S. 488, 497, 94 S.Ct. 669, 676-77, 38 L.Ed.2d 674 (1974) (plaintiffs challenging alleged discriminatory bail-setting, jury selection, and sentencing lacked standing to seek injunction because no showing that they were likely to be arrested and subjected to the challenged practices); Golden v. Zwickler, 394 U.S. 103, 108-09, 89 S.Ct. 956, 959-60, 22 L.Ed.2d 113 (1969) (plaintiff previously convicted for distributing anonymous handbills in past election campaign but whose being subjected to statute in future was "most unlikely" lacked standing to seek declaratory relief for future campaigns).
 
 
 18
 We believe that the injury asserted here is sufficient to confer standing on AGCC. In all cases in which the Supreme Court denied standing because the injury was too speculative there was either little indication in the record that the plaintiffs had firm intentions to take action that would trigger the challenged governmental action, or little indication in the record that, even if plaintiffs did take such action, they would be subjected to the challenged governmental action. Here, by contrast, the record indicates that AGCC members have firm intentions to bid for San Francisco city contracts, and that the application of the ordinance to such city bids is compulsory in nature. See Coral Const. Co. v. King County, 941 F.2d 910, 929-30 (9th Cir.1991). The mere fact that AGCC members cannot play on an even field against MBEs subjects them to a legally cognizable injury: "[a]s a result of the objectively unequal bidding process under the preference method of awarding contracts, an injury results not only when [a non-MBE] actually loses a bid, but every time the company simply places a bid." Id. at 930. Moreover, the chill alleged by AGCC to result from the ordinance, because the ordinance is compulsory in nature, must also be deemed a legally cognizable injury. Cf. Del Percio v. Thornsley, 877 F.2d 785, 787 (9th Cir.1989) (plaintiff's "generalized claim that [challenged] statute's very existence has an inhibiting effect on her exercise of her right[s]", in absence of likelihood that statute will be applied to plaintiff, insufficient to confer standing). Accordingly, we find that AGCC meets the first prong of the Hunt test.[5]
 
 
 19
 Neither do we find that the third prong of the Hunt test, the requirement that the suit not demand "the participation of individual members," bars AGCC from standing in this court. We have previously found this requirement to be met when the claims proffered and relief requested do not demand individualized proof on the part of its members. Compare United Union of Roofers v. Insurance Corp. of America, 919 F.2d 1398, 1400 (9th Cir.1990) (denying standing because "individual Union members will have to participate at the proof of damages stage") with Alaska Fish & Wildlife Fed'n v. Dunkle, 829 F.2d 933, 938 (9th Cir.1987) (allowing standing "because the [organization] seeks declaratory and prospective relief rather than money damages [and thus] its members need not participate directly in the litigation"). Because neither AGCC's claims nor their request for declaratory and injunctive relief require such individualized proof, under this interpretation of Hunt's third prong, the organization must be deemed to have standing.
 
 
 20
 In a post-argument submission to this court, the Intervenors call to our attention Maryland Highways Contractors Association v. Maryland, 933 F.2d 1246 (4th Cir.), cert. denied --- U.S. ----, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991), in which the United States Court of Appeals for the Fourth Circuit dismissed a similar action for lack of standing. In that case, the court found that an association of contractors seeking to challenge a minority business enterprise statute lacked standing to bring suit on behalf of its members, among other reasons, on the basis of a different interpretation of Hunt's third prong than that previously used by our circuit. According to the Fourth Circuit, "[t]his prong is not met when conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." Id. at 1252. The Fourth Circuit denied standing on the ground that
 
 
 21
 the members of the Association in this case have conflicting interests. Some of the members of the Association are certified MBEs; they benefit from the continued enforcement of the MBE statute. Other non-minority members of the Association would benefit if the MBE statute were declared unconstitutional. Thus, there are actual conflicts of interest which would require that the individual members come into the lawsuit to protect their interests.
 
 
 22
 Id. at 1253; see also Associated Gen. Contractors v. Otter Tail Power Co., 611 F.2d 684, 691 (8th Cir.1979) (denying organization representational standing because organization's members' "status and interests are too diverse and the possibilities of conflict too obvious to make the association an appropriate vehicle to litigate the claims of its members").
 
 
 23
 We reject the invitation to expand our interpretation of Hunt's third prong to require that no actual or potential conflict exist between the organization's members for several reasons. First, we do not believe that the Supreme Court intended this requirement to be included in Hunt's third prong. In Hunt, the Supreme Court found that the Washington Apple Advertising Commission, a Washington state agency formed to promote apple sales, had standing to contest a North Carolina law restricting the labeling of containers in which apples were shipped. The Court found the third prong of the test met simply because "neither the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context." 432 U.S. at 344, 97 S.Ct. at 2442. The Court never inquired into whether the apple growers and dealers represented by the Commission would unanimously agree to the position taken by the Commission in the suit. Similarly, in UAW v. Brock, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Supreme Court found that a union had standing to sue on behalf of its workers to challenge the Secretary of Labor's interpretation of the Trade Act of 1974. Again, in finding the third prong of the test met, the Court sought only to determine that no individualized proof was required: "Neither [the Union's] claims nor the relief sought required the District Court to consider the individual circumstances of any aggrieved UAW member. The suit raises a pure question of law: whether the Secretary properly interpreted the Trade Act's TRA eligibility provisions." Id. at 287, 106 S.Ct. at 2531. Moreover, in no other case in which the Supreme Court has cited Hunt has it sought to impose a condition of unanimity on an organization's members.
 
 
 24
 In addition, we believe that the Supreme Court implicitly decided the issue of whether unanimity of membership should be required for standing in UAW v. Brock. In that case, the Secretary urged that the Hunt test be overruled and that, instead, the Court apply the rules for class actions set out in Federal Rule of Civil Procedure Rule 23 on the ground that only the class action rules "contain[ ] special safeguards to ensure that the diverse interests of class members are properly represented by the named plaintiff seeking to bring a case on their behalf ... [while] [n]o such adequacy of representation ... is guaranteed by the approach this Court has taken to associational standing." Id. at 288-89, 106 S.Ct. at 2531-32. The Court rejected the Secretary's argument based on its recognition of the special advantages derived from allowing associations to bring suit, advantages which provide benefits "both to the individuals represented and to the judicial system as a whole." Id. at 289, 106 S.Ct. at 2532. According to the court, "[w]hile a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital." Id. The Court stated that it was not "prepared to dismiss out of hand the Secretary's concern that associations allowed to proceed under Hunt will not always be able to represent adequately the interests of all their injured members," but concluded that the proper remedy in such a situation would be to deny claim preclusion against members of "an association ... deficient in this regard" or to adopt some other remedy short of requiring unanimity. Id. at 290, 106 S.Ct. at 2533. While the Court did not explicitly rule that it would impose no requirement of unanimity on organizations seeking associational standing, its statements in Brock clearly counsel against imposition of such a standard.
 
 
 25
 Furthermore, as a matter of policy, we reject the suggestion that unanimity of membership be required in organizations seeking standing. Most organizations are formed with far broader purposes than could be represented by a single piece of legislation or other policy challenged. Unanimous opinions within an organization's membership will be few and far between with regard to most issues controversial enough to engender litigation. To insist that there be neither conflict nor potential for conflict on any issue litigated would, in effect, lead to the eradication of associational standing in most suits. Such a rule would disserve the public interest, which frequently would not be represented but for these suits.
 
 
 26
 Accordingly, we conclude that an organization's internal conflicts properly should be resolved through its own internal procedures, not through limitations on standing. Our ruling should not be deemed to allow the silencing of dissenters' voices within an organization: the interests of these dissenters should be taken into account either through liberal approval of their intervention in the lawsuit or, as the Brock Court suggested, through refusal to preclude subsequent claims by dissenting members. Accord National Maritime Union v. Commander, Military Sealift Command, 824 F.2d 1228, 1231-34 (D.C.Cir.1987); cf. Gillis v. Dep't of Health & Human Servs., 759 F.2d 565, 572-73 (6th Cir.1985). However, so long as the position taken in litigation has the clear mandate of the association represented, standing should not be denied.II. THE MOTION FOR PRELIMINARY INJUNCTION
 
 
 27
 We next consider whether the district court properly denied AGCC's motion for preliminary injunction. To obtain a preliminary injunction, the moving party must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir.1975) (emphasis in original). "These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases." Big Country Foods, 868 F.2d at 1088. Under either formulation of the test, the party seeking the injunction must demonstrate that it will be exposed to some significant risk of irreparable injury. Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668 (9th Cir.1988). A plaintiff must do more than merely allege imminent harm sufficient to establish standing, he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1201 (9th Cir.1980). Here, AGCC charges that the district court should have entered a preliminary injunction on both its charter claim and its equal protection claim. We analyze each claim separately.
 
 A. AGCC's Charter Claim
 
 28
 Prior to the passage of the 1989 Ordinance, City Charter § 7.200 provided:
 
 
 29
 When the expenditure for any public work ... shall exceed the sum of ... fifty thousand dollars ($50,000), the same shall be done by contract.... The head of the department in charge of or responsible for the work for which a contract is to be let, ... shall let such contract to the lowest reliable responsible bidder.
 
 
 30
 In 1986, by vote, the City's residents amended the section to add the following language:
 
 
 31
 Beginning with fiscal year 1987-88, the board of supervisors shall be authorized to increase or decrease by ordinance the dollar amount set forth in any provision in this section.
 
 
 32
 On the basis of the amended provision, the Board enacted the bidding threshold ordinance, which raised the competitive bidding threshold from $50,000 to $10,000,000, thereby allowing the bid preference system established in the 1989 Ordinance to become effective for bids under $10,000,000.
 
 
 33
 AGCC argues that both the bidding threshold ordinance and the amendment to section 7.200 violate the California constitution, which mandates that all amendments to city charters be made by vote of the city's residents. The court below denied AGCC's motion for preliminary injunction on the charter claim based on its finding that AGCC had failed to demonstrate a sufficient risk of irreparable injury. The court found that, as a factual matter, an insufficient risk of injury was presented because no AGCC member asserted denial of a contract due to the MBE provisions and only one member asserted that he was deterred from bidding by the Ordinance. It also found that any injury suffered by AGCC's members would be pecuniary and redressable at law. Because of its finding on the issue of irreparable injury, the district court did not consider the likelihood that AGCC would prevail on the merits of its charter claim. On appeal, AGCC challenges the district court's conclusion.
 
 1. Possibility of irreparable injury
 
 34
 AGCC argues that the district court erred in concluding that it failed to demonstrate a sufficient possibility of irreparable injury. According to AGCC, as a factual matter, it had demonstrated far more than a slight possibility that its members would suffer injury. AGCC also contends that the district court erred as a matter of law in determining that any injury suffered could be compensated by money damages and was therefore not irreparable.
 
 
 35
 We need not determine whether any injury suffered would be irreparable. We determine only that, if any irreparable injury were suffered, it would not be so great as to require issuance of a preliminary injunction given our preliminary assessment of the merits. As stated infra, we find that AGCC has failed to demonstrate that it is likely to succeed on the merits of the charter issue; at most, it has raised serious questions on the merits. Thus, to warrant the issuance of a preliminary injunction, AGCC must demonstrate that the balance of hardships tips sharply in its favor. In this case, the hardships that would be caused to women and minorities by issuance of a preliminary injunction barring implementation of the 1989 Ordinance in combination with the City's important interest in remedying discriminatory practices must be weighed against any hardships incurred by AGCC. In balancing these interests, we conclude that AGCC has failed to make the requisite showing that the balance of hardships tips sharply in its favor.
 
 2. Likelihood of success on the merits
 
 36
 The basic outlines of California law on the issue of charter amendments are clear. California Constitution article XI, section 3, provides that a county or city may adopt a charter by majority vote of its electorate voting on the question and amend the charter in the same manner. According to the Supreme Court of California, this procedure "is exclusive and controlling, and any charter provision in conflict therewith is invalid." Uhl v. Collins, 217 Cal. 1, 17 P.2d 99 (1932); see also Alexander v. Mitchell, 119 Cal.App.2d 816, 260 P.2d 261, 264 (1953). Thus, in Montgomery v. Board of Administration, 34 Cal.App.2d 514, 93 P.2d 1046 (1939), the Supreme Court of California stated that San Diego's city council had no power to pass ordinances that conflicted with the city's charter, despite provisions in the charter that allowed the Board to "establish such rules and regulations as it may deem proper." According to the court, "[i]f section 146 of the charter must be construed as giving authority to the city council of San Diego by ordinance to add or subtract from the charter provisions or make regulations ... inconsistent with the clear provisions of that document, it must be held to be unconstitutional as attempting to permit the amendment of the charter in an unauthorized manner." Id. 93 P.2d at 1049.
 
 
 37
 Despite this clear dictate of California law, application of the principle to the case at hand produces no clear results. While California law emphatically prohibits the Board from amending the charter, it does not provide guidance to aid in our determination of whether the bidding threshold ordinance challenged here should be deemed such an unlawful amendment to a charter. Left to predict how California would determine this issue, however, we conclude that while AGCC may have raised serious questions on the merits, it has not demonstrated probable success on them. In requiring that all amendments to a city charter be by vote of the people, California intended to ensure that the ultimate power to govern remained in the hands of its citizens. We are not convinced that the actions taken by the electorate and the Board implicate this concern. At argument, AGCC's counsel conceded that if the City had passed a charter amendment repealing the previous $50,000 bidding threshold and stating that Board could set a new bidding threshold within a particular range, the amendment would be legitimate. Although the charter amendment passed was less specific, it clearly was intended to accomplish exactly that.[6] See also AGCC I, 813 F.2d 922, 927 n. 9. We therefore conclude that AGCC has failed to demonstrate that a sufficient probability exists that the ordinance will be found to violate the California Constitution.
 
 B. AGCC's Constitutional Claims
 
 38
 AGCC also contends that the preferences given to MBEs[7] violate the equal protection clause of the Fourteenth Amendment of the United States Constitution.[8] The court below found that AGCC demonstrated the requisite possibility of irreparable injury on the ground that such injury is assumed where constitutional rights have been alleged to be violated. It denied the motion for preliminary injunction on AGCC's constitutional claim, however, on the ground that AGCC failed to demonstrate a likelihood of success on the merits. On appeal, AGCC argues that the district judge incorrectly applied relevant law in concluding that it was unlikely to prevail on its claims.
 
 1. Possibility of irreparable injury
 
 39
 We have stated that "[a]n alleged constitutional infringement will often alone constitute irreparable harm." Goldie's Bookstore v. Superior Ct., 739 F.2d 466, 472 (9th Cir.1984). In this case, we need not determine whether AGCC's allegations would be entitled to such a presumption of harm.[9] Instead we find that, whether or not AGCC would be entitled to such a presumption, the organization has not demonstrated a sufficient likelihood of success on the merits of its constitutional claims to warrant the grant of a preliminary injunction. See id. (While allegations of constitutional infringement might be sufficient to presume irreparable harm, "[i]n this case, ... the constitutional claim is too tenuous to support our affirmance on that basis.").
 
 2. Likelihood of success on the merits
 
 40
 A city may use "some form of narrowly tailored racial preference" where such a measure is "necessary to break down patterns of deliberate exclusion." Croson, 488 U.S. at 509, 109 S.Ct. at 729 (plurality). Indeed, "[t]he remedy for intentional discrimination often calls for race-specific relief," Coral Const. 941 F.2d at 921. However, "[a] race-conscious remedy without a race-based injury is constitutionally infirm." Id. To "smoke out" illegitimate uses of race, the Supreme Court has directed that strict scrutiny be applied to all race-conscious programs. Croson, 488 U.S. at 493, 109 S.Ct. at 721. To survive this test, a municipality's classifications based on race must serve a compelling state interest and must be narrowly tailored to further that interest. Wygant v. Jackson Board of Education, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). We discuss each prong in turn.
 
 A. Compelling state interest
 
 41
 In Croson, a majority of the Supreme Court delineated the scope of discrimination that a race-conscious remedy could properly seek to redress. According to the Court, a municipality has a compelling interest in redressing, not only discrimination committed by the municipality, itself, but also discrimination committed by private parties within the municipality's legislative jurisdiction, so long as the municipality in some way perpetuated the discrimination to be remedied by the program. See 488 U.S. at 491-92, 109 S.Ct. at 719-20 (Rehnquist, C.J., White, J., O'Connor, J.); Id. at 537-38, 109 S.Ct. at 744-45 (Brennan, Marshall, Blackmun). To satisfy this requirement, "the governmental actor need not be an active perpetrator of such discrimination; passive participation will satisfy this sub-part of strict scrutiny review." Coral Const., 941 F.2d at 916 (citation omitted). In addition, the "[m]ere infusion of tax dollars into a discriminatory industry may be sufficient governmental involvement to satisfy this prong." Id.
 
 
 42
 In applying these guidelines to the race-conscious ordinance at issue in Croson, the Supreme Court found that Richmond's factual predicate fell short of its constitutional mark. According to the Court, the city's mere recitation of a remedial basis for its racial classifications was entitled to little or no weight. 488 U.S. at 500, 109 S.Ct. at 724. Furthermore, the Court criticized allegations of proponents of the legislation that discrimination existed in the construction industry as conclusory, unrelated to the Richmond construction industry, and to have little probative value. Id. at 498, 109 S.Ct. at 723. The Court also faulted the city's assertions that it had a compelling interest based on the disparity in the percentage of contracts awarded to minority-owned businesses and the percentage of minorities in the city as a whole. Id. at 501-02, 109 S.Ct. at 725-26. According to the Court, "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualification) may have little probative value." Id. at 501, 109 S.Ct. at 725 (quoting Hazelwood School Dist. v. United States, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977)). Finally, the Court rejected the city's attempts to bolster the ordinance's factual predicate based on Congress' finding of discrimination in the construction industry. The Court stressed that for the constraints of the equal protection clause to remain effective, states and local agencies must use their own factfinding processes to establish the presence of discrimination in their own bailiwicks. Id. 488 U.S. at 504, 109 S.Ct. at 726-27. Because Richmond offered no further justification for its assertions of past discrimination, the Court held that Richmond's plan lacked the required " 'strong basis in evidence for [the council's] conclusion that remedial action was necessary.' " Id. at 500, 109 S.Ct. at 724 (majority opinion) (quoting Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 277, 106 S.Ct. 1842, 1848-49, 90 L.Ed.2d 260 (1986) (plurality opinion)).
 
 
 43
 Our decision in AGCC I provides further direction in our assessment of the factual predicate necessary to justify San Francisco's race-conscious remedy.[10] In that case, this circuit found that statistics relied upon by San Francisco to support the 1984 Ordinance failed to identify discrimination with the precision required to demonstrate a compelling interest. We noted that by comparing the percentage of MBEs who received contracts from the City with the percentage of MBEs in the city at large, the City failed to take into account that a disproportionate number of MBEs in the city at large might not provide goods or services subject to significant contracting by the City; thus the disproportionate number of contracts awarded to non-MBEs might be explainable by reasons other than discrimination in the contracting process. AGCC I, 813 F.2d at 933-34. We also found the City's statistics to be inadequate because, although the race-conscious remedies benefited MBEs based outside of San Francisco, the City limited its statistical inquiry in determining whether non-MBEs received a disproportionate percentage of contracts to the racial makeup of San Francisco. We stated that any plan that extended race-conscious remedies beyond territorial boundaries "must be based on very specific findings that actions the city has taken in the past have visited racial discrimination on such individuals." Id. at 934.
 
 
 44
 Measuring the 1989 Ordinance against these principles, we believe that AGCC has failed to demonstrate that it is sufficiently likely to prevail on the merits of its constitutional claim to warrant the issuance of a preliminary injunction. In contrast to the "mere recitation of a 'benign' or legitimate purpose" criticized in Croson, 488 U.S. at 500, 109 S.Ct. at 724, the record in this case discloses that the Board made detailed findings of prior discrimination in construction and building within the City's borders. Based on testimony taken at more than ten public hearings and on numerous written submissions from the public, the Board found that City departments continued to discriminate against MBEs and WBEs and continued to operate under the "old boy network" in awarding contracts, thereby disadvantaging MBEs and WBEs. 1989 Ordinance Ch. 12D.2. Furthermore, it found that large statistical disparities existed between the percentage of contracts awarded to MBEs and the percentage of available MBEs. Id. According to the Board's findings, "[t]he disparity cannot be attributed to chance.... [T]he Board finds that the results can only be attributed to discriminatory procurement practices...." Id. The Board also found "discrimination in the private sector against MBEs and WBEs that is manifested in and exacerbated by the City's procurement practices."
 
 
 45
 The City's findings appear supported by the record. A study commissioned by the City and prepared by BPA Economics, Inc., indicates the existence of large disparities between the award of city contracts to available non-minority businesses and to MBEs. Using the City and County of San Francisco as the "relevant market," the study compared the number of available MBE prime construction contractors in San Francisco with the amount of contract dollars awarded by the City to San Francisco-based MBEs for the 1987-88 fiscal year. It found that available MBEs received far fewer city contracts in proportion to their numbers than their available non-minority counterparts. Specifically, the study found that with respect to prime construction contracting, the disparities between the number of available Asian, Black, and Hispanic owned locally based firms and the number of contracts awarded to such firms was statistically significant and supported an inference of discrimination. For example, in prime contracting for construction, although MBE availability was 49.5%, MBE dollar participation was only 11.1%; in prime contracting for equipment and supplies, although MBE availability was 36%, MBE dollar participation was only 17%; and in prime contracting for general services, MBE availability was 49% although MBE dollar participation was only 6.2%. In our recent decision, Coral Const., we emphasized that such statistical disparities are "an invaluable tool" in demonstrating the discrimination necessary to establish a compelling interest. Coral Const., 941 F.2d at 918; see also Croson, 488 U.S. at 509, 109 S.Ct. at 729 (plurality) ("[W]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.").
 
 
 46
 Moreover, the record documents a vast number of individual accounts of discrimination, which bring "the cold numbers convincingly to life." Coral Const., 941 F.2d at 919 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1976)). These accounts include numerous reports of MBEs being denied contracts despite being the low bidder, MBEs being told they were not qualified although they were later found qualified when evaluated by outside parties, MBEs being refused work even after they were awarded the contracts as low bidder, and MBEs being harassed by City personnel to discourage them from bidding on city contracts. On appeal, the City points to numerous individual accounts of discrimination to substantiate its findings that discrimination exists in the City's procurement processes, that an "old boy network" still exists, and that racial discrimination is still prevalent within the San Francisco construction industry. Such a "combination of convincing anecdotal and statistical evidence is potent." Coral Const., 941 F.2d at 919; see also Croson, 488 U.S. at 509, 109 S.Ct. at 729, ("[E]vidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified.").
 
 
 47
 AGCC challenges specific pieces of evidence proffered by San Francisco to justify the 1989 Ordinance. It argues first that the results of the BPA study, which the Board relied on heavily to support its findings of discrimination, were skewed to underrepresent the amount of contract dollars awarded to minorities. As support, AGCC points to statistics presented in the City's Budget Analysis of March 17, 1989, that indicate that MBEs received 36.7% of prime contract dollars awarded in fiscal year 1987-88, a far higher percentage than reflected in the BPA study. Data used in the City's Budget Analysis were also used to calculate the BPA statistics. The City argues that the disparity in the results of the two studies stems from refinements made to the relevant data in the BPA study in order to tailor the data more closely to the 1989 Ordinance's scope. For example, the City contends that BPA limited the data to contracts awarded to MBEs in the City and County area and verified particular data used in the City's Budget Analysis before including it in the BPA study. AGCC responds that refinements made to the data in the BPA study are improper, but it specifically faults only one refinement: the alleged exclusion of all Public Works construction contracts of less than $250,000 from the data. AGCC argues this exclusion would result in undercounting MBEs, which would presumably be newer, smaller, and more apt to bid for smaller contracts. The City, however, points to evidence within the record indicating that BPA in fact included the lower-priced contracts within the BPA data. Because AGCC raises no other specific contention regarding the inaccuracy of the BPA study, and because of evidence in the record contradicting BPA's assertion regarding the inclusion of lower-priced contracts, we conclude that the district court's finding that the BPA statistics were reliable was not clearly erroneous.
 
 
 48
 AGCC also argues that the statistics relied upon by the City to demonstrate discrimination in its contracting processes fail to meet the standards we established in AGCC I because they consider only MBEs located within San Francisco. Again, AGCC fails to demonstrate a substantial likelihood of success on the merits of this issue. In AGCC I, we faulted the City for failing to determine whether its past actions had visited racial discrimination on MBEs outside of its borders because the scheme adopted by the 1984 Ordinance allowed non-resident MBEs to obtain benefits. 813 F.2d at 933-34. In contrast to the 1984 Ordinance, the 1989 Ordinance applies only to resident MBEs. The City therefore appears appropriately to have confined its study to the city limits in order to focus on those whom the preference scheme targeted.
 
 
 49
 Furthermore, AGCC contends that the City's findings of discrimination fail to rise to the level of specificity demanded by both AGCC I and Croson. However, the City's findings are substantially more specific than those found inadequate in these prior cases. In addition, they are clearly based upon dozens of specific instances of discrimination that are laid out with particularity in the record, as well as significant statistical disparities in the award of contracts. As pointed out by the City, it must simply demonstrate the existence of past discrimination with specificity; there is no requirement that the legislative findings specifically detail each and every instance that the legislative body has relied upon in support of its decision that affirmative action is necessary. Cf. Croson, 488 U.S. at 501, 109 S.Ct. at 725 ("[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination.") (quoting Hazelwood Sch. Dist., 433 U.S. at 307-08, 97 S.Ct. at 2741-42); Wygant, 476 U.S. at 292-93, 106 S.Ct. at 1856-57 (O'Connor, J., concurring) (the public employer need not "convinc[e] the court of its liability for prior unlawful discrimination" but rather simply must demonstrate "a firm basis for concluding" that affirmative action is warranted). Unlike the exceedingly sparse foundation for the City of Richmond's findings of discrimination, the record in this case indicates that San Francisco is likely to demonstrate a "strong basis in evidence" supporting its decision to adopt a race-conscious plan.[11]
 
 B. Narrowly Tailored
 
 50
 To survive strict scrutiny, not only must a race-conscious remedy serve a compelling state interest, it must be narrowly tailored to redress the consequences of discrimination. Croson, 488 U.S. at 507-08, 109 S.Ct. at 728-29. In Coral Construction, we isolated three characteristics identified by the Croson court as indicative of narrow tailoring. First, "an MBE program should be instituted either after, or in conjunction with, race neutral means of increasing minority business participation in public contracting." 941 F.2d at 922. Second, the plan should avoid the use "of rigid numerical quotas." Id. According to the Supreme Court, systems that permit waiver in appropriate cases and therefore require some individualized consideration of the applicants pose a lesser danger of offending the Constitution. Croson, 488 U.S. at 507-08, 109 S.Ct. at 728-29. Mechanisms that introduce flexibility into the system also prevent the imposition of a disproportionate burden on a few individuals and guard against the unfair exploitation of these plans, two circumstances we cautioned against in AGCC I. AGCC I, 813 F.2d at 936. Third, "an MBE program must be limited in its effective scope to the boundaries of the enacting jurisdiction." Coral Const., 941 F.2d at 922.
 
 
 51
 AGCC argues that the Ordinance does not possess the first indicium of narrow tailoring; according to AGCC the City improperly failed to adopt race-neutral means to accomplish its objectives. The record indicates, however, that the City considered, but rejected as not viable, specific race-neutral alternatives including creating a fund to assist newly established MBEs in meeting bonding requirements. As we stated in Coral Const., "while strict scrutiny requires serious, good faith consideration of race-neutral alternatives, strict scrutiny does not require exhaustion of every possible such alternative.... however irrational, costly, unreasonable, and unlikely to succeed such alternative may be." 941 F.2d at 923. Moreover, the record demonstrates that the City has attempted to use race-neutral means to address the problem of discrimination. It is undisputed that the City more than ten years ago attempted to eradicate discrimination in city contracting through passage of a race-neutral ordinance that prohibited city contractors from discriminating against their employees on the basis of race and required contractors to take steps to integrate their work force. The record further indicates that the City made and continues to make efforts to enforce the anti-discrimination ordinance. "Inclusion of such race-neutral measures is one factor suggesting that an MBE plan is narrowly tailored." Id. at 923.
 
 
 52
 The 1989 Ordinance at issue in this case also appears to possess the requisite flexibility necessary to withstand a motion for preliminary injunction. Rather than the rigid quota system found faulty in Croson, the City has adopted a more modest system, that of bid preferences. As we noted in AGCC I, the advantages provided by such preferences "are relatively slight[;] ... there are no goals, quotas, or set-asides." 813 F.2d at 943; see also Coral Const., 941 F.2d at 924 ("The percentage preference method ... is simply not a quota."). Moreover, the plan remedies only specifically identified discrimination: the City provides preferences only to those minority groups found to have previously received a lower percentage of specific types of contracts than their availability to perform such work would suggest.[12] For example, Black-owned medical services firms do not receive preferences because they have not been disadvantaged in the past with respect to the award of these contracts. For the same reasons, San Francisco's program does not provide for a bid preference for Asian- or Latino-owned architectural/engineering or computer system firms. In addition, since the Ordinance confines the preference to those who are economically disadvantaged, MBEs are prevented from using the preferences to obtain windfalls.
 
 
 53
 In addition, the burdens of the bid preferences on those not entitled to them appear relatively light and well distributed. During the first six months the 1989 Ordinance was in effect, 92.7% of all construction prime contracting dollars awarded to San Francisco firms went to non-MBEs. In addition, in contrast to remedial measures struck down in other cases, those bidding have no settled expectation of receiving a contract. See Metro Broadcasting Inc. v. Fed. Communications Comm'n, --- U.S. ----, 110 S.Ct. 2997, 3026, 111 L.Ed.2d 445 (1990) (racial preference plan for obtaining FCC licenses contravenes " 'no legitimate firmly rooted expectation[s]' of competing applicants", thus rendering the burden on nonminorities "slight") (quoting Johnson v. Transp Agency, Santa Clara County, 480 U.S. 616, 638, 107 S.Ct. 1442, 1455-56, 94 L.Ed.2d 615 (1987)); cf. Wygant, 476 U.S. at 281-82 n. 8, 106 S.Ct. at 1850-51 n. 8 (finding undue burden imposed by school board program on plaintiffs fired from job because of race) (plurality opinion). In addition, under the Ordinance, non-MBE firms can take advantage of the preference through joint ventures with MBEs. Finally, the 1989 Ordinance allows businesses to file complaints requesting waivers in particular circumstances, including where MBEs or WBEs are unavailable. 1989 Ordinance at Ch. 12D.13. The nine-month report from the City and County of San Francisco indicates that the City has waived preferences for approximately 44% of contracting dollars awarded under the 1989 Ordinance.
 
 
 54
 That the 1989 Ordinance is "limited in its geographical scope to the boundaries of the enacting jurisdiction," Coral Const., 941 F.2d at 925, also increases its likelihood of being sustained on the merits. Unlike the 1984 Ordinance, and the program considered in Coral Const., San Francisco has carefully limited the 1989 ordinance to benefit only those MBEs located within the City's borders. The Ordinance therefore redresses only the effects of discrimination within the City's own legislative jurisdiction. Based on the likelihood that, in ruling on the merits, the district court could find all three circumstances associated with narrow tailoring present, we do not find the district court abused its discretion in determining AGCC would not likely succeed with respect to this claim.
 
 CONCLUSION
 
 55
 The district court did not abuse its discretion in denying AGCC's request for a preliminary injunction enjoining enforcement of the bid preference ordinance pending decision on the merits. On its charter claims, AGCC at most raises serious questions, but fails to demonstrate that the balance of hardships tips sharply in its favor. On its constitutional claims, AGCC fails to demonstrate a sufficient likelihood of success on the merits.
 
 
 56
 AFFIRMED.
 
 
 57
 O'SCANNLAIN, Circuit Judge, specially concurring:
 
 
 58
 While I agree with my colleagues that the district court properly denied AGCC's request for preliminary injunctive relief, I cannot concur in their analytical approach.
 
 
 59
 * I am unable to accept the assertion that AGCC has not demonstrated probable success on the charter amendment issue. As the opinion acknowledges, ante at 1411, California law is clear. A vote of the people, as provided in the California Constitution, is the sole and exclusive means of amending a city charter. Uhl v. Collins, 217 Cal. 1, 17 P.2d 99 (1932). The California courts jealously guard the people's right of initiative as enumerated in the constitution; the California Supreme Court has stated that it is "required to resolve any reasonable doubts in favor of the exercise of this precious right." Brosnahan v. Brown, 32 Cal.3d 236, 186 Cal.Rptr. 30, 32, 651 P.2d 274, 276 (1982). See also Amador Valley Joint Union High School Dist. v. State Bd. of Equalization, 22 Cal.3d 208, 149 Cal.Rptr. 239, 259-60, 583 P.2d 1281, 1302 (1978).
 
 
 60
 The majority can point to no instance in which the constitutional requirement has not been rigidly applied. Policy arguments against its imposition in this circumstance, see ante at 1411, cannot overcome the "clear dictate of California law," ante at 1411. I am persuaded that AGCC has demonstrated a substantial likelihood of success on this issue.
 
 
 61
 Accordingly, I must go on to reach the question of whether AGCC has shown a possibility of irreparable harm justifying the issuance of a preliminary injunction. I conclude that it has not. AGCC's members will be harmed by the allegedly invalid charter amendment only if they are denied contracts valued at over $50,000 but less than $10,000,000 due to the bid preferences for MBEs and WBEs. The sole evidence of injury to AGCC members in the record is the declaration of Paul Hodgson. Although Mr. Hodgson declares that his firm has been discouraged from bidding on city contracts by the 1989 Ordinance, he does not mention the size of the contracts his firm would otherwise have sought. Thus, there is no evidence in the record that any AGCC member has lost a bid due to the charter amendment, or has even been discouraged from bidding by that amendment. I must therefore conclude that AGCC has not met its burden of "demonstrat[ing] immediate threatened injury" rather than simply alleging speculative harm.[1] Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir.1988). See also Big Country Foods, Inc. v. Board of Educ., 868 F.2d 1085, 1088 (9th Cir.1989) (upholding denial of preliminary injunction where record "barren of evidence of lost profits").
 
 II
 
 62
 Although I agree with the majority that AGCC has not shown a likelihood of success on the merits of its equal protection claim, I write separately to emphasize the limited nature of appellate review of the grant or denial of a preliminary injunction. Detailed consideration of the merits of AGCC's constitutional claim is neither necessary nor appropriate in this context. The issue is not the constitutionality of the 1989 Ordinance, but simply whether AGCC has shown a sufficient probability of success on the merits to justify preliminary relief.
 
 
 63
 Although I do not necessarily disagree with it, the detailed discussion of the statistical evidence presented to the district court, see ante at 1414-15, as well as much of the discussion of whether the 1989 Ordinance meets the requirements of Croson, is inappropriate. Because the Ordinance reasonably appears to comply with Croson, the district court did not abuse its discretion in refusing to grant a preliminary injunction. This court need not say more. Our decision on this narrow issue today should not be regarded as determinative of the ultimate resolution of the dispute. See Big Country Foods, 868 F.2d at 1087.
 
 
 
 [1]
 The decision produced no single opinion that reflected the majority's views. Instead, Justice O'Connor announced the judgment of the Court and delivered the opinion of the Court with respect to several portions of an opinion in which Chief Justice Rehnquist, and Justices White, Stevens, and Kennedy joined. Other portions of Justice O'Connor's opinion were joined by Judges Rehnquist, White, and Kennedy. Both Justices Stevens and Kennedy filed opinions concurring in part and concurring in the judgment. Justice Scalia filed an opinion concurring in the judgment. Justices Brennan, Marshall, and Blackmun dissented from the result reached by the majority
 
 
 [2]
 The action does not challenge the lawfulness of provisions of the ordinance relating to purchase or service contracts or those providing preferences favoring LBEs
 
 
 [3]
 An organization may also have standing to sue on its own behalf. See Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). Because we find that AGCC had standing to assert the rights of its members, however, we do not consider whether AGCC may have standing to seek judicial relief stemming from its own injury
 
 
 [4]
 The record contains a number of other declarations from AGCC members detailing the injuries caused by San Francisco's MBE ordinance. These declarations, however, relate solely to the injury caused by the 1984 Ordinance. Because of the significant differences between the 1984 and 1989 Ordinances, detailed supra, we decline to assume that any injury that may have been caused by the 1984 Ordinance would also be caused by the 1989 Ordinance
 
 
 [5]
 For the same reasons that we find this injury not to be so speculative as to warrant denial of standing, we reject any claim that the issues presented here are not ripe for review because the case involves uncertain future events. The ordinance challenged in this suit is currently in effect; those determining whether to bid on city contracts are currently basing their decisions on its existence. Thus, the ordinance's effects are not confined to the future. See Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 736 n. 15, 100 S.Ct. 1967, 1977 n. 15, 64 L.Ed.2d 641 (1980) (consumer group that found attorney unwilling to supply information requested for legal services directory because of state bar rule against advertising had established a case or controversy ripe for review by the state supreme court in its capacity as an enforcing agency); C. Wright, A. Miller, & E. Cooper, 13A Federal Practice & Procedure § 3532.2 (2d ed. 1984)
 
 
 [6]
 AGCC also argues that Ordinance No. 424-89 is unlawful because it was passed for racially discriminatory reasons and therefore violates AGCC's members' rights to equal protection. While there is little evidence in the record regarding the Board's motivations for passing the ordinance, it appears reasonable to assume that the Board passed it in order to facilitate its MBE preference scheme. However, AGCC's claims that the ordinance constitutes unlawful discrimination based on race would warrant the issuance of a preliminary injunction only if AGCC demonstrates a likelihood of success on the merits of its equal protection claims. We consider these claims infra at Part II.B.2
 
 
 [7]
 Although AGCC's charter claims challenge the preferences given to both WBEs and MBEs, its constitutional claims challenge only the preferences given to MBEs
 
 
 [8]
 AGCC also asserts that the MBE bid preferences violate rights secured by 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Section 1983 provides a cause of action for the deprivation under color of state law of any rights, privileges, or immunities secured by the Constitution and federal laws. The rights protected by section 1983 are coextensive with the equal protection clause's guarantee against racial discrimination. See AGCC I, 813 F.2d at 928 n. 11. Accordingly, we resolve AGCC's section 1983 claim in our discussion of the equal protection clause
 Section 1981 provides in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens...." This section prohibits discrimination against nonminorities as well as minorities. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295, 96 S.Ct. 2574, 2585, 49 L.Ed.2d 493 (1976). We have previously noted that "[i]t is not entirely clear whether ... section 1981[ ] gives protections beyond those provided by the fourteenth amendment." AGCC I, 813 F.2d at 928 n. 11. We do not address the issue on appeal, however, as AGCC confines its legal argument to the scope of the equal protection clause. See Brady v. Gebbie, 859 F.2d 1543, 1557 (9th Cir.1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (refusing to consider argument not sufficiently argued in appellate brief); Northwest Acceptance Corp. v. Lynnwood Equipment Inc., 841 F.2d 918, 924 (9th Cir.1988) (same).
 
 
 [9]
 We note that in Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. Jacksonville, Fla. 896 F.2d 1283 (11th Cir.1990), the Eleventh Circuit refused to presume irreparable injury from allegations of equal protection violations when it found the primary damage that plaintiff asserted to be "chiefly, if not completely, economic." Id. at 1285-86. We do not consider this issue because we conclude that, whether or not irreparable injury could be presumed here, plaintiff has failed to demonstrate a sufficient likelihood of success on the merits
 
 
 [10]
 The declaration of the Croson plurality that a city "can use its spending powers to remedy private discrimination," 488 U.S. at 492, 109 S.Ct. at 720 (O'Connor, J., Rehnquist, C.J., and White), in conjunction with the opinion of the three dissenting justices, Id. at 528, 109 S.Ct. at 739 (Marshall, J., Brennan, J., and Blackmun, J.), appears implicitly to overrule our requirement in AGCC I that to justify a race-based preference, "the state or local government must be acting to remedy government-imposed discrimination." AGCC I, 813 F.2d at 930; See Coral Const., 941 F.2d at 916 n. 6. Nonetheless, the remainder of our discussion in AGCC I of the factual predicate necessary to justify race-based preferences remains precedent that is binding on this court
 
 
 [11]
 AGCC also contends that the 1989 Ordinance must be struck down because it fails to identify specific bid practices that caused the racial imbalance as required by the Supreme Court in Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). In doing so, AGCC seeks to have us engraft the framework for title VII set out in Atonio onto Croson's equal protection framework. This proposition has never been sanctioned either explicitly or implicitly in the equal protection context by the Supreme Court or this court. To do so would appear to violate the Supreme Court's statement in Croson that statistical disparities alone would be sufficient to support a showing of discrimination sufficient to institute a race-conscious remedial plan. Croson, 488 U.S. at 509, 109 S.Ct. at 729. Furthermore, it would undercut Croson's recognition that a governmental actor may "use its spending powers to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment." Id. at 492, 109 S.Ct. at 720. Finally, by imposing the same burden imposed on a plaintiff in a private sector employment discrimination suit, it would fail to take into account the special burden imposed on states and municipalities to enact programs to eliminate discrimination. As we stated in AGCC I, "a state or its political subdivision has the authority--indeed the 'constitutional duty,' Wygant, 476 U.S. at 291, 106 S.Ct. at 1856 (O'Connor, J. concurring) (emphasis original)--to ascertain whether it is denying its citizens equal protection of the laws and, if so, to take corrective steps." AGCC I, 813 F.2d at 929; see also Coral Const., 941 F.2d at 920 ("The remedy for intentional discrimination often calls for race-specific relief.")
 
 
 [12]
 We find AGCC unlikely to prevail on its argument that tailoring the remedy to specific minority groups is insufficient to meet constitutional requirements, and that to pass constitutional muster any remedy adopted must provide redress only to specific individuals who have been identified as victims of discrimination. To reach any other decision would thwart the Supreme Court's directive in Croson that race conscious remedies may be permitted in some circumstances. As pointed out by the district court, "an iron clad requirement limiting any remedy to individuals personally proven to have suffered prior discrimination would render any race conscious remedy superfluous." 748 F.Supp. at 1455; see also Wygant v. Jackson Bd. of Educ, 476 U.S. at 287, 106 S.Ct. at 1854 (an affirmative action plan "need not be limited to the remedying of specific instances of identified discrimination for it to be deemed sufficiently 'narrowly tailored.' ") (O'Connor J., concurring)
 We also find AGCC unlikely to prevail on its contention that the remedy encompassed within the 1989 Ordinance is not sufficiently tailored to the discrimination found by the Board because it does not individually remedy each type of discrimination suffered. For example, AGCC argues that the bid preference is not narrowly tailored to remedy injuries suffered by those who have been the low bidder on contracts but were still not awarded contracts by City officials. Race-conscious plans, by their nature, are not tailored to remedy individual injuries suffered by individual victims. Here, the City has found that continued discrimination places MBEs at a competitive disadvantage and seeks to counteract this situation by providing MBEs with a counterbalancing advantage. We find this nexus between violation and remedy to be close enough to warrant affirmance of the district court's denial of the motion for preliminary injunction.
 
 
 [1]
 Because I find that AGCC has not shown a sufficient possibility of any injury due to the charter amendment, I need not determine if allegations of loss of profits due not to the city's refusal to award the contract to a low bidder but rather to failure to bid at all would justify preliminary injunctive relief