**GAY–STRAIGHT ALLIANCE NETWORK and George Loomis, Plaintiffs,**

v.

**VISALIA UNIFIED SCHOOL DISTRICT, by and through its Board of Education; Carlyn Lambert, Superintendent; Linda Gonzales, former Superintendent; Bob Cesena, Principal; Gig Stevens, Assistant Principal, Juan Garcia; and Does 1–25, inclusive, Defendants.**

No. CIV.F 00–6616 OWW LJ.

United States District Court, E.D. California.

March 28, 2001.

As Amended April 9, 2001.

George S. Loomis, Fresno, CA, pro se.

John Elliott Eichorst, Howard Rice Nemerovski Canady Falk and Rabkin, San Francisco, CA, for Gay-Straight Alliance Network.

John Laurence Rozier, Nelson Rozier and Bettencourt, Visalia, CA, for Defendants.

MEMORANDUM OPINION AND OR-DER RE: DEFENDANT'S MO-TION TO DISMISS FOR FAILURE TO STATE A CLAIM; INDEFI-NITE STATEMENT; MOTION TO STRIKE; PARTIAL SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION OF ISSUES

WANGER, District Judge.

## I. INTRODUCTION

Defendants' move to dismiss Plaintiffs First Amended complaint for failure to state a claim, indefinite statement, to strike portions of the complaint and for summary adjudication of issues. *See* Doc. 10. Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1343. *See* Doc. 8, ¶ 19. Supplemental jurisdiction is invoked under 28 U.S.C. § 1367(a). *See id.* Oral argument was held March 19.2001.

## II. BACKGROUND

### A. Gay–Straight Alliance Network

### 1. Purpose and Membership

Plaintiff, GAY–STRAIGHT ALLIANCE NETWORK ("GSA Network"), is a youth-led, non-profit organization made up of gay, lesbian, bisexual, transgender and heterosexual students, as well as support-ive adults, who are dedicated to eliminat-ing homophobia and intolerance in schools. *See* Doc. 8, ¶ 7. The GSA Network is headquartered in San Francisco and has an office in Fresno, California. *See id.* GSA Network's Fresno office monitors homophobia and intolerance in Central Valley schools, including schools within the Defendant, VISALIA UNIFIED SCHOOL DISTRICT ("VUSD"). *See id.* The GSA Network has devoted significant monetary and staffing resources to ad-dressing the problems of discrimination, harassment, and homophobia in VUSD schools through its Fresno office. *See id.,* ¶ 10.

The GSA Network primarily fights hom-ophobia and intolerance in schools by em-powering gay, lesbian, bisexual, transgen-der and heterosexual members in high schools to form and maintain local, school-based, student-run clubs called "GSAs". *See id.,* ¶ 8. The GSA Network also en-courages members to form community-based GSAs made up of students and sup-portive community members. *See id.* One-hundred fifty (150) GSA clubs in Northern California and the Central Val-ley are presently registered with the GSA Network. *See id.* The GSA Network con-nects these school- and community-based GSAs to each other and to community resources in order to: foster safe environ-ments for student members; educate stu-dent members and the school community about homophobia, gender identity, and sexual orientation issues; and fight intoler-

ance, discrimination, harassment, and violence in schools. *See id.*

Members of the GSA Network in Fresno and Visalia have formed a community-based GSA club in the Fresno area. *See id.,* ¶ 10. It's members include current and prospective students at Golden West High School and other schools within the VUSD. *See id.,* ¶ 9. Some of these students are interested in forming a school-based GSA at Golden West or other high schools within the VUSD. *See id.* These students have not done so, however, because of the alleged homophobic environment within the VUSD and possible retaliatory harassment. *See id.,* ¶ 65. Heterosexual youth and adults, including parents of children who attend or plan to attend VUSD, also belong to the GSA Network. *See id.,* ¶ 9.

## 2. *Hostile Environment*

It is alleged that openly gay students are subject to severe verbal and physical harassment and suffer physical and emotional damage from Defendants' allegedly hostile environment. *See id.,* ¶ 64. Heterosexual students are deprived of an environment that is free from hostility directed toward students who are gay or lesbian or who are perceived to be gay or lesbian. *See id.,* ¶ 66.

Harassment and discrimination is alleged to be a fact of life for gay or lesbian students, or those perceived as gay or lesbian, attending schools within the VUSD, including Golden West High School. *See id.,* ¶ 22. These students have been repeatedly called "faggot", "queer", and other anti-gay epithets on campus and in the classrooms, sometimes in the presence of teachers. *See id.,* ¶¶ 22, 27. One gay student allegedly confronted his teacher after class about students making loud, derogatory, anti-gay comments in class. *See id.,* ¶ 23. The teacher told the student

that he did not hear the comments and refused to do anything about them. *See id.*

Gay or lesbian students, or those perceived as gay or lesbian, have been spit upon by other students on the campus of Golden West. *See id.,* ¶ 27. Former Golden West students, perceived to be gay, have had food, pencils, erasers, and textbooks and other objects thrown at them. *See id.* One gay student was almost hit by a car driven by another student who was actively trying to run him down. *See id.* One student directed a death threat to a gay student at Golden West. *See id.* Golden West students have also allegedly spray-painted the word "Fag" on a pickup truck of another student. *See id.*

One gay student at Golden West was attacked on campus by students yelling "fag", "queer" and other derogatory terms. *See id.,* ¶ 28. When the student fought back, Golden West administrators broke up the fight and led the gay student away in handcuffs. *See id.* That student did not return to Golden West. *See id.*

Students are allegedly afraid to associate themselves with any openly gay students on campus for fear of being verbally and physically assaulted. *See id.,* ¶ 29. Students who are gay or lesbian experience chronic psychological injury from the harassment at school each day. *See id.* One gay student suffers from insomnia and lies awake each night reviewing the harassment he suffered during the day and worrying about what might happen tomorrow. *See id.* Students skip classes in order to avoid harassment. *See id.* As a result, their grades suffer, they fail classes, and they contemplate dropping out of school. *See id.*

Some gay students fear asking the administration for help for fear of retaliation. *See id.,* ¶ 41. Other gay or lesbian students have complained repeatedly to Gold-

en West teachers and administrators about the hostile climate on campus, but to no avail. *See id.* Parents have also attempted to intervene; however, the VUSD has not acted. *See id.*, ¶ 42.

### 3. *Teacher and Administrator Involvement*

Teachers and administrators have allegedly participated in, and perpetuated the taunting and harassment of gay or lesbian students. *See id.*, ¶ 31. One teacher has made anti-gay comments in class; Plaintiffs believe that other such incidents may have occurred with other teachers. *See id.* Administrators have allegedly mocked or ignored students who have requested relief from the anti-gay harassment. *See id.* One Golden West office worker allegedly posts anti-gay comments on a bulletin board in the school office. *See id.*

VUSD allegedly does not fund, sponsor, endorse, or promote any organization, support group, or program that provides support to student victims of anti-gay harassment. *See id.*, ¶ 35. No gay student group or school-based organization comprised of gay and straight members exists within the VUSD. *See id.*

VUSD allegedly has a policy designed to deter gay or lesbian students from being open about their sexual orientation and freely associating with one another. *See id.*, ¶ 36. VUSD also allegedly has no policy to ensure that its schools are safe for gay or lesbian students, or those perceived as gay or lesbian. *See id.*, ¶ 37. VUSD's current policy is allegedly inadequate in preventing students from taunting, harassing, and assaulting other gay or lesbian students, or those perceived as gay or lesbian. *See id.*

VUSD teachers, counselors, and administrators are allegedly not trained in how to assist student victims of anti-gay harassment. *See id.*, ¶ 38. VUSD's alleged practice has been to ignore any

harassment and refuse to make any attempts to stop students and teachers from perpetrating any further acts of harassment. *See id.*

### 4. *Independent Study Program*

VUSD administrators and counselors allegedly force victims of anti-gay harassment into independent study programs, adult schools, or other alternative educational programs in order to isolate these students from their peers. *See id.*, ¶ 46. Other times, administrators and counselors encourage, convince, or allow gay or lesbian students, or those perceived as gay or lesbian, to leave school altogether. *See id.* Once these students have been effectively transferred from their classrooms into alternative education programs, they lose their ability to participate in extracurricular activities, receive an inadequate education, and limit their college opportunities. *See id.*, ¶ 64.

Under the independent study programs ("ISP"), students study independently, and meet with a teacher for a one-hour class once a week. *See id.*, ¶ 47. The ISP is a non-college preparatory academic track designed for students with extremely difficult home lives, seriously disabilities, substance abuse problems, or dire financial needs. *See id.* ISP students are ineligible for participation in extracurricular activities. *See id.* The ISP is not educationally equivalent to classroom education at Golden West; it was not designed to, and does not, address any of the needs of anti-gay harassment victims. *See id.*

Some gay and lesbian students have sought entrance to the ISP to avoid harassment by peers and teachers at Golden West. *See id.*, ¶ 48. These students have been deliberately encouraged to do so by school officials. *See id.* The students are sometimes promised by counselors that the ISP will help end their harass-

ment. *See id.* One former guidance counselor advised a gay student to get a job so that she could place him in an ISP to "get him out" of Golden West. *See id.*

### B. *George Loomis*

Plaintiff, GEORGE LOOMIS, was enrolled in schools within the VUSD, including Golden West High School, until sometime around January 2000. *See id.,* ¶ 13.

Defendant, VISALIA UNIFIED SCHOOL DISTRICT ("VUSD"), is a public school district that controls and operates Golden West High School and other public schools in the Visalia area. *See id.,* ¶ 14. Defendants, LINDA GONZALES, former VUSD Superintendent of Schools; CARLYN LAMBERT, Acting VUSD Superintendent of Schools; BOB CESENA, Principal of Golden West High School; GIG STEVENS, Assistant Principal of Golden West High School; and JUAN GARCIA, teacher at Gold West High School, are individuals who worked during the relevant time period as employees for the VUSD. *See id.,* ¶ 15.

Mr. Loomis allegedly endured pervasive harassment while he was at Golden West from 1996 to about January 2000. *See id.,* ¶ 24. Once students at Golden West suspected that Mr. Loomis was gay, they began taunting and harassing him. *See id.* In the spring semester of Mr. Loomis' junior year (1998–99), some of his classmates in Advance Placement ("AP") Biology class called him "faggot" and "queer" in front of the entire class. *See id.* Mr. Loomis' teacher would often laugh along with the students who were harassing Mr. Loomis and not reprimand these students. *See id.*

Students in Mr. Loomis' choir class would also taunt Mr. Loomis with yells of "fag", "queer", "homo" and "joto" (Spanish for "homo"). *See id.,* ¶ 25. One male student taunted Mr. Loomis by rubbing Plaintiff's leg in a sexually suggestive manner, embarrassing Mr. Loomis with this unwanted touching. *See id.* Students in Mr. Loomis' choir class would also threaten and harass other students by calling them "fag" or "faggot". *See id.,* ¶ 25. Mr. Loomis' choir teacher observed these activities and took no action. *See id.*

Mr. Loomis was harassed by students in his student leadership class. *See id.,* ¶ 26. One student accused Mr. Loomis of having an affair with the male teacher of the class who was perceived by many students to be gay. *See id.*

Teachers and classes of students openly discussed their views that Mr. Loomis was gay during a science and English class in spring of 1999. *See id.,* ¶ 32. Mr. Loomis had not revealed to anyone at Golden West that he was gay, much less to these particular teachers from whom Mr. Loomis had not taken a class. *See id.*

#### 1. *Comment by Mr. JUAN GARCIA*

In October 1999, Defendant, JUAN GARCIA, Mr. Loomis' Spanish II teacher noticed the ear ring Mr. Loomis was wearing. *See id.,* ¶ 33. Mr. Garcia stated to the class: "There are only two types of guys who wear ear rings—pirates and faggots—and there isn't any water around here." *See id.* The entire class laughed at Mr. Garcia's remarks; Mr. Loomis was shocked, angry, and upset. *See id.* Mr. Loomis was also upset and embarrassed when Mr. Garcia repeated the comment in English to make sure that everyone could understand it. *See id.* Students increasingly harassed Mr. Loomis after this incident, calling Mr. Loomis "pirate", "fag" and "faggot". *See id.*

In October 1999, Mr. Loomis went to the principal of Golden West, Defendant, ROBERT CESENA, and told him what Mr. Garcia said. *See id.,* ¶ 43. Mr. Cesena told Mr. Loomis that it was "inappropriate" for Mr. Loomis to "go over Mr.

Garcia's head", that he should talk to Mr. Garcia, and that he would take no further action. *See id.*

Mr. Loomis took Mr. Cesena's suggestion and went to Mr. Garcia and asked him not to make further anti-gay comments in class. *See id.*, ¶ 44. Mr. Garcia responded by laughing at Mr. Loomis. *See id.* The following week, Mr. Garcia repeatedly called Mr. Loomis a "pirate" and repeated the same comment Mr. Loomis asked Mr. Garcia not to repeat ("There are only two types of guys who wear ear rings ...."). *See id.*

In October 1999, after Mr. Garcia repeatedly aired his "pirates and faggots" remark at Golden West, Mr. Loomis went to the school psychologist at Golden West, and spoke with her about how the harassment was making him feel. *See id.*, ¶ 49. Mr. Loomis informed her that the harassment was negatively affecting his ability to learn and function at Golden West. *See id.* The Golden West psychologist suggested that things might be better for Mr. Loomis if he removed himself from full-time attendance at Golden West to attend the Independent Study Program ("ISP"). *See id.*

### 2. *Switching to the Independent Study Program*

Officials at Golden West did not mention that switching to ISP would have a harmful adverse impact on Mr. Loomis' extracurricular activities, his decision to attend college, and his future overall. *See id.*, ¶ 50. The school psychologist told Mr. Loomis that she was planning on meeting with Assistant Principal, Defendant, GIG STEVENS, later that day, and that she would suggest to Mr. Stevens that the school transfer Mr. Loomis to ISP. *See id.* The psychologist told Mr. Loomis that although she recommended ISP, school officials would not protect him from being tormented even then. *See id.*

Mr. Loomis later met with his guidance counselor, Ms. Cuca Atherton, to discuss whether ISP was a good idea for him. *See id.*, ¶ 51. Ms. Atherton explained to Mr. Loomis that she had already discussed the ISP program with Mr. Loomis' psychologist, and that she also thought it was in Mr. Loomis' best interests to enroll in the ISP. *See id.* She explained that, although most ISP students were required to demonstrate to the school administration that they had a financial need to work at least forty (40) hours a week and demonstrate proof of employment, the school "wouldn't worry about this requirement" in Mr. Loomis' case. *See id.* Instead, without any reference to the financial status of Mr. Loomis or his family, Ms. Atherton told Mr. Loomis to go home and have his guardian sign a form declaring that his family had a "financial need" for him to enroll in the ISP. *See id.*

That same day, Mr. Stevens called Mr. Loomis into his office and advised Mr. Loomis that he had spoken with Mr. Loomis' guidance counselor and psychologist, and that they all agreed that Mr. Loomis should enroll in the ISP. *See id.*, ¶ 52. Although Mr. Loomis' guardian, Ms. Donna Wothe, was worried how the program might look to university admissions officers, Mr. Loomis and his guardian officially signed the papers enrolling him in the ISP sometime in mid-October 1999. *See id.*, ¶ 53.

VUSD officials knew that Mr. Loomis was heavily involved in extracurricular activities at Golden West and that Mr. Loomis intended to pursue higher education. *See id.*, ¶ 54. While Mr. Loomis was at Golden West, he was a member of the Gifted and Talented Education program (GATE) and aspired to attend the University of California at Berkeley to study pre-medicine and eventually go to medical school. *See id.* Mr. Loomis was

also a member of the track and cross-country teams, sang in the school choir, and was one of a select group of students who were chosen to enroll in an exclusive student leadership class based on the recommendation of one of his teachers. *See id.*

In Mr. Loomis' junior year, he was chosen to be a student representative on the VUSD Board of Education. *See id.* Mr. Loomis' guidance counselor, Ms. Atherton told Plaintiff that he could continue to serve as a student representative while attending ISP. *See id.,* ¶ 55. When Mr. Loomis attempted to attend a VUSD Board of Education meeting, he found that he had been replaced by another student. *See id.* Mr. Loomis was then told that ISP students could not serve on the Board. *See id.* Mr. Loomis was also unable to participate in extracurricular programs which he was led to believe he could still participate in. *See id.,* ¶ 56. Mr. Loomis planned to interview with recruiters from the University of California at Berkeley, but they refused to talk to him after learning he was in ISP. *See id.*

### 3. *Ms. Sarah Karam Sproles; Mr. GIG STEVENS*

In November 1999, Plaintiff was working at his part-time job in a camera store. *See id.,* ¶ 39. Ms. Sarah Karam Sproles, a Golden West school counselor entered the store with a friend. *See id.* While in the store, Ms. Sproles turned to her friend and said, "That boy is a faggot." *See id.* It is unclear whether Mr. Loomis heard the remark directly or was told about Ms. Sproles' alleged remark. Mr. Loomis was stunned, outraged and hurt. *See id.* When Mr. Loomis later confronted Ms. Sproles at her office at Golden West, Ms. Sproles initially denied making the statement at all. *See id.* She later admitted making the statement; however, she claimed that she was talking about another Golden West student, whom she was coun-

seling. *See id.* That student also happened to be in the camera store at the same time as Mr. Loomis. *See id.*

While Mr. Loomis was confronting Ms. Sproles, the Assistant Principal, Defendant, GIG STEVENS, walked into Ms. Sproles' office. *See id.,* ¶ 59. For no apparent reason, Ms. Sproles stated, "This is George Loomis and he is gay." *See id.* Mr. Stevens stated mockingly to Mr. Loomis in a high-pitched effeminate voice, "Well, George, why didn't you say that. Why didn't you say, 'My name is George and I am gay?'" *See id.* Mr. Loomis felt humiliated. *See id.*

Mr. Loomis told Mr. Stevens and Ms. Sproles that he did not feel safe attending Golden West High School, and asked Mr. Stevens whether he would make some effort to ease the harassment that Mr. Loomis was receiving from other students while he attended his ISP class. *See id.* Each week, many students called him "fag" and "faggot" and at least on one occasion spit on him. *See id.,* ¶ 58. Mr. Stevens refused to help, and told Mr. Loomis that if he did not feel safe then he should give up high school altogether and attend adult school. *See id.* Mr. Stevens then waved Mr. Loomis' ISP papers in his face and told Mr. Loomis that he was in breach of his ISP contract because he had missed two days of ISP class. *See id.*

Mr. Loomis told Mr. Stevens that he would not come onto the Golden West campus unless he was assured that he would be safe from teacher and student harassment. *See id.,* ¶ 60. Mr. Stevens told Mr. Loomis that he could not promise him that the school would be safe for him. *See id.* Mr. Loomis stopped attending Golden West altogether. *See id.,* ¶ 61. To the best of Mr. Loomis' knowledge, no credit was given for his ISP work. *See id.*

#### 4. *Ms. LINDA GONZALES*

Between October and December 1999, Mr. Loomis tried to contact, then-VUSD Superintendent, Defendant, LINDA GONZALES, to discuss the constant harassment Mr. Loomis was receiving. *See id.,* ¶ 45. Ms. Gonzales did not return any of Mr. Loomis' phone calls. *See id.* In December 1999, Mr. Loomis went to Ms. Gonzales' office but was informed she was not in that afternoon. *See id.* Mr. Loomis related to Ms. Gonzales' assistant the conditions of harassment he was facing at Golden West. *See id.* Ms. Gonzales' assistant promised to pass these notes to Ms. Gonzales. *See id.* Mr. Loomis did not receive a response from Ms. Gonzales. *See id.*

#### 5. *Further Injuries and Illness*

By January 2000, Mr. Loomis was suffering chronic stress-related illnesses and was diagnosed as hypo-glycemic. *See id.,* ¶ 62. Mr. Loomis lost both his jobs in January 2000 because he was missing work as a result of stress-related events at Golden West. *See id.*

When the Fresno Bee published an article about Mr. Loomis and his harassment at Golden West, teachers photocopied the article and distributed it to students in class. *See id.,* ¶ 41. One teacher made a remark to a class to the effect that "Well, we can't talk about religion, but we can talk about this faggot boy." *See id.* Throughout the spring 2000 semester, other teachers revealed private facts about Mr. Loomis' life in trying to explain why he might be "troubled". *See id.*

#### C. *Plaintiff's First Amended Complaint*

Plaintiffs assert eight (8) claims. *See* Doc. 1. Plaintiffs first six federal claims are brought under 42 U.S.C. § 1983. *See id.* Plaintiff, GSA NETWORK, asserts Equal Protection [First Claim], Procedural

Due Process [Third Claim], and Substantive Due Process [Fifth Claim] violations of the Fourteenth Amendment by Defendants, VUSD, by and through its Board of Education, and Carlyn Lambert, Bob Cesena, an Gig Stevens in their official capacities. *See id.*

Plaintiff, GEORGE LOOMIS, asserts Equal Protection [Second Claim]; Procedural Due Process [Fourth Claim]; and Substantive Due Process [Sixth Claim] violations of the Fourteenth Amendment against Defendants, Linda Gonzales, Bob Cesena, Gig Stevens, and Juan Garcia in their individual capacities. *See id.*

Mr. Loomis asserts state law violations of the California Education Code [Seventh Claim] against Defendants VUSD, Linda Gonzales, Bob Cesena, Gig Stevens and Juan Garcia in their individual capacities. *See id.* Mr. Loomis asserts violation of the Unruh Civil Rights Act [Eighth Claim] by Defendants Linda Gonzales, Bob Cesena, Gig Stevens and Juan Garcia in their individual capacities. *See id.*

Plaintiffs pray for a declaratory relief stating that GSA Network's rights are being violated; an injunctive relief ordering Defendants to halt their allegedly unconstitutional and unlawful acts; an award of compensatory damages and punitive damages to Mr. Loomis; attorneys fees and costs. *See id.* Plaintiffs demand a jury trial. *See id.*

### III. *LEGAL STANDARD*

#### A. *Motion to Dismiss for Failure to State a Claim*

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is disfavored and rarely granted: A dismissal for failure to state a claim is appropriate only where it appears, beyond a doubt, that the plaintiff can prove no set of facts that would entitle it to

relief. *Morley v. Walker,* 175 F.3d 756, 759 (9th Cir.1999); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to [the] plaintiff. *See Enesco Corp. v. Price/Costco Inc.,* 146 F.3d 1083, 1085 (9th Cir.1998).

 A district court is not entirely limited to considering facts in the complaint. Facts subject to judicial notice may be considered on a motion to dismiss. *See Mullis v. United States Bankruptcy Ct.,* 828 F.2d 1385, 1388 (9th Cir.1987). For example, matters of public record may be considered, including pleadings, orders, and other papers filed with the court or records of administrative bodies. *See Shaw v. Hahn,* 56 F.3d 1128, 1129 n. 1 (9th Cir.1995). Conclusions of law, conclusory allegations, unreasonable inferences, or unwarranted deductions of fact in a complaint need not be accepted. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Documents attached to the complaint are part of the complaint and may be considered on a motion to dismiss. *See Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987); *see also Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994) ( [A] document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned.).

B. *Motion to Dismiss for Indefinite Statement*

Federal Rule of Civil Procedure 12(e) provides:

If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

 A Rule 12(e) motion is proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted. *See Famolare, Inc. v. Edison Bros. Stores, Inc.,* 525 F.Supp. 940, 949 (E.D.Cal.1981). The Court must deny the motion if the complaint is specific enough to apprise defendant of the substance of the claim being asserted. *See Bureerong v. Uvawas,* 922 F.Supp. 1450, 1461 (C.D.Cal.1996). The Court should also deny the motion if the detail sought by a motion for more definite statement is obtainable through discovery. *See Beery v. Hitachi Home Electronics (America), Inc.,* 157 F.R.D. 477, 480 (C.D.Cal.1993).

C. *Motion to Strike*

 A court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed.R.Civ.P. 12(f). A motion to strike under Rule 12(f) should be denied unless it can be shown that no evidence in support of the allegation would be admissible, or those issues could have no possible bearing on the issues in the litigation. *See Pease & Curren Refining v. Spectrolab,* 744 F.Supp. 945, 947 (C.D.Cal.1990), *abrogated on other grounds by Stanton Rd. Assocs. v. Lohrey Enters.,* 984 F.2d 1015 (9th Cir.1993); *LeDuc v. Kentucky Central Life Ins. Co.,* 814 F.Supp. 820, 830 (N.D.Cal.1992). A motion to strike is limited to pleadings. *Sidney–Vinstein v. A.H. Robins Co.,* 697 F.2d 880, 885 (9th Cir.1983).

## IV. *ANALYSIS*

### A. *Judicial Notice*

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.Evid. 201(b). "A court shall take judicial notice if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d). Often judicially noticed facts consist of matters of public record, such as prior court proceedings, *see, e.g., Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1198 (9th Cir.1988) or administrative materials, *see, e.g., Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir.1994).

■ In this case, Defendants request judicial notice of certified copies of official records showing the registration of the VISALIA UNIFIED SCHOOL DISTRICT with the Roster of Public Agencies. *See* Doc. 14. These records are maintained by the Tulare County Recorder's office and the California Secretary of State. *See id.* Copies of these documents have been supplied as Exhibits "A" and "B". *See* Doc. 12, Ex. "A"; Doc. 16, Ex. "B".

Exhibit A contains a filed and stamped copy of the State of California, Roster of Public Agencies Filing, showing the Visalia Unified School District is registered pursuant to California Government Code Section 53051. *See* Doc. 12, Ex. "A". The copy has been filed and certified by the Tulare County Clerk–Recorder on December 18, 1998 and most recently on February 1, 2001. *See id.*

Exhibit B contains three copies of documents from the State of California, showing the Visalia Unified School District is registered with the Roster of Public Agencies. *See* Doc. 12, Ex. B. Each of the three documents have been filed and certified by the Office of the Secretary of State of the State of California on December 17, 1998; December 21, 1999; and December 22, 2000. *See id.*

Defendants have requested judicial notice and supplied the necessary documents. Defendants' request for judicial notice of certified copies of official records maintained by the Tulare County Recorder's office and the California Secretary of State showing the registration of the VISALIA UNIFIED SCHOOL DISTRICT with the Roster of Public Agencies, is GRANTED.

### B. *GSA Network Standing*

■ The doctrine of standing "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).

"[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."

■ *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97

S.Ct. 2434, 53 L.Ed.2d 383 (1977) (quoting *Warth,* 422 U.S. at 515, 95 S.Ct. 2197). An association has standing to bring an action when:

> "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt,* 432 U.S. at 343, 97 S.Ct. 2434; *International Union, United Auto., Aerospace & Agricultural Implement Workers v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). The first two *Hunt* criteria satisfy Article III's "case or controversy" requirement, while the third is merely prudential, promoting only administrative convenience and efficiency. *See Ecological Rights Foundation v. Pacific Lumber Company,* 230 F.3d 1141, 1147 fn. 6 (9th Cir.2000). Courts have generally found the second prong, or germaneness test, to be undemanding. *See Presidio Golf Club v. National Park Service,* 155 F.3d 1153, 1159 (1998); *Humane Soc'y of the United States v. Hodel,* 840 F.2d 45, 58 (D.C.Cir.1988).

"'For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing court must accept as true all material allegations of the complaint, and must construe the complaint if favor of the complaining party.'" *See Desert Citizens Against Pollution,* 231 F.3d at 1178 (quoting *Graham v. Federal Emergency Management Agency,* 149 F.3d 997, 1001 (9th Cir.1998)) (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. 2197).

### 1. *Immediate or Threatened Injury*

 To meet *Hunt*'s first prong, the "'association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Hunt,* 432 U.S. at 342, 97 S.Ct. 2434 (quoting *Warth,* 422 U.S. at 511, 95 S.Ct. 2197). Individual members would have standing in their own right under Article III if they have suffered an "injury in fact" that is concrete and particularized, actual and imminent, the injury is fairly traceable to the challenged action of the defendant; and it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Ecological Rights Foundation,* 230 F.3d at 1147, citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A mere "abstract concern", *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), or "special interest" in a public issue, *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), is legally insufficient to confer standing.

#### a. *Injury in Fact*

 GSA Network asserts that it has members who are current and prospective students at Golden West High School and other high schools within the VUSD. GSA Network asserts that its members have been spit on, threatened, their property damaged, attacked, harassed by students and teachers and administrators, and actively encouraged to transfer from the normal high school curriculum, in effect denying them a free public education. GSA Network alleges that its members have repeatedly complained to VUSD teachers, administrators, and counselors about how the homophobic environment at Golden West and other VUSD schools was interfering with their learning experience and safety. VUSD administrators and teachers are alleged to have deliberately ignored these students' pleas for help, or

actively sought the transfer of such students to an ISP or adult alternative program. GSA alleges it has spent money and used staff to try to combat discrimination and harassment of its members in VUSD schools. ¶ 10.

The harms sought to be redressed by GSA Network on behalf of its members to redress deprivation of education rights are currently suffered by GSA members and will continue to be suffered by GSA Network members absent relief. Accepting as true these allegations, GSA Network alleges injury in fact that is "immediate or threatened" injury to itself and its members sufficient to confer associational standing. Defendants' motion to dismiss for failure to state a claim for lack of standing as to the GSA Network is DE-NIED.

*Defendants' caselaw*

Defendants' reliance on *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), for the proposition that GSA Network must suffer some harm before asserting the rights of its members is misplaced. The "injury in fact" requirement for associational standing is "immediate or threatened injury". *See Hunt*, 432 U.S. at 342, 97 S.Ct. 2434; *Warth*, 422 U.S. at 511, 95 S.Ct. 2197.

Defendant's reliance on *Hunt* and *Alaska Wildlife Alliance v. Jensen*, 108 F.3d 1065, 1068 (9th Cir.1977), is similarly misplaced. Contrary to Defendants' assertions, Plaintiffs need not allege that a statute is unconstitutional as a prerequisite to standing. *See Desert Citizens Against Pollution*, 231 F.3d at 1177 (plaintiff need not allege non-compliance with statute or regulation). "Applying this type of categorical rule runs counter to precedent recognizing that standing 'is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief.'" *Id.*, quoting *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 703–04 (D.C.Cir.

1988). "Standing is based upon the nature of the injury alleged and whether a favorable decision would redress the injury." *Id.*

*Warth* also does not support Defendants' assertion that GSA Network's members have not suffered a cognizable injury in fact. Defendants' rely on *Warth* for essentially two propositions: (1) "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant the exercise of jurisdiction", and (2) a "plaintiff must generally assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197.

In *Warth*, the petitioner association sought to represent the interests of taxpayers or persons of low or moderate income. *See id.*, at 512, 95 S.Ct. 2197. The Supreme Court found petitioners' grievances too general in nature to allow the organization to have standing. *See id.*, at 515–516, 95 S.Ct. 2197.

Here, the verbal harassment, physical threats, humiliation by peers and teachers are allegedly suffered only by gay or lesbian students, and those perceived to be gay or lesbian. These alleged harms do not affect all or a large class of citizens, but rather a small, but cognizable minority. The harm suffered of being called a "fag", "faggot", "homo", or similar opprobriations is not a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens", but a particular harm suffered by gay or lesbian students, or those perceived to be gay or lesbian.

Defendants' argument that GSA Network has attached its claims to co-Plaintiff, George Loomis's, is also misplaced. The alleged harms suffered by GSA Network members include one gay student being

nearly hit by a car driven by another student trying to run him down. *See* Doc. 8, ¶ 27. Another student allegedly directed a death threat to a gay student member at Golden West. *See id.* Golden West students allegedly spray-painted the work "Fag" on a pickup truck of another student. *See id.* These students are allegedly called "faggot", "queer", and other anti-gay epithets repeatedly in the presence of teachers. *See id.,* ¶ 22. Administrators allegedly mock or ignore students requesting relief from anti-gay harassment. *See id.,* ¶ 31. One school office worker at Golden West allegedly posts anti-gay comments on a school-office bulletin board. *See id.* Gay and lesbian students are encouraged to transfer out of Golden West into ISP programs. *See id.,* ¶ 48. GSA Network has allegedly spent money trying to address these issues and devote staff time to working with alleged victims. These alleged harms suffered to its members and to the Network are separate and distinct from those harms asserted by Mr. Loomis. GSA Network has not attempted to assert the legal rights of Mr. Loomis.

"In all cases in which the Supreme Court denied standing because the injury was too speculative there was either little indication in the record that the plaintiffs had firm intentions to take action that would trigger the [challenged action], or little indication in the record that, even if plaintiffs did take such action, they would be subjected to the [challenged action]." *Associated General Contractors of California, Inc. v. Coalition For Economic Equity,* 950 F.2d 1401, 1407 (9th Cir.1991) (discouragement from participating in city-mandated bidding process for government contract combined with firm intentions to participate in bidding process satisfies "immediate and threatened" harm for associational standing requirement); *cf. City of Los Angeles v. Lyons,* 461 U.S. 95, 101–05, 103 S.Ct. 1660, 1664–67, 75 L.Ed.2d 675 (1983) (plaintiff previously subjected to police stranglehold lacked standing to seek injunctive relief absent showing he was likely to be exposed to future police brutality); *O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 676–77, 38 L.Ed.2d 674 (1974) (plaintiffs challenging alleged discriminatory bail setting, jury selection, and sentencing lacked standing to seek injunction because no showing that they were likely to be arrested and subjected to the challenged practices); *Golden v. Zwickler,* 394 U.S. 103, 108–09, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969) (plaintiff lacked standing where previously convicted for distributing anonymous handbills in past election campaign, plaintiff was "most unlikely" to be subjected to statute in future lacked standing to seek declaratory relief for future campaigns).

Here, the GSA Network alleges its members wish to form a GSA club on the Golden West campus but are afraid to do so for fear of retaliation, humiliation, and further harassment from peers, teachers, administrators and counselors. *See* Doc. 8, ¶ 65. The allegations of discrimination and harassment are that the conduct and hostile environment is continuing. Such allegations, construed most favorably to the complainant, establish the active intent to form a GSA Network club on the Golden West campus or other VUSD campuses, and the immediate threat of harm to all students who would join and participate in such a club. Evidence may prove otherwise, however, on this motion the assertions are taken as true.

#### b. *Redressability*

■ In determining standing for an association, a federal plaintiff must show only that a favorable decision is likely to redress his injury, not that a favorable decision will inevitably redress his injury. *See Desert Citizens Against Pollution,* 231 F.3d at 1178.

■ In this case, GSA Network seeks declaratory relief claiming that the Defendants' acts "violate the Fourteenth Amendment to the Constitution of the United States, California Education Code Sections 200 *et. seq.,* and Civil Code Section 51 *et seq*"; and that such rights must be respected and protected. *See* Doc. 8, 35:14–18. GSA Network also asks for an injunction ordering Defendants to take action and to develop policies to alleviate the allegedly hostile and intolerant environment in public schools within the VUSD. *See id.,* 35:19–22. GSA Network asks for injunctive relief to stop Defendants alleged coercion of students; harassment on the basis of their sexual orientation; their diversion into alternative educational programs and ISPs; requiring defendants to implement mandatory training programs for VUSD faculty and staff on issues relating to diversity, homophobia, and means of intervention; creating policies for teachers and administrators for dealing with students who have been harassed or discriminated against on the basis of actual or perceived sexual orientation; and conducting assemblies in VUSD high schools for all students, teachers, and administrators on diversity, homophobia and tolerance. *See id.,* 35:23–36:17.

A declaratory judgment or preliminary injunction in GSA Network's favor could likely alleviate the alleged harassment and discrimination against gay and lesbian students, as well as those perceived to be gay or lesbian. Gay and lesbian students would be more likely to attend class full time; teachers and administrators would be more responsive to illegal harassment and discrimination against gay or lesbian students. A decision in GSA Network's favor is likely to redress the alleged injuries suffered by it and its members.

Plaintiff, GSA network has shown that " 'its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.' "

### 2. *Organization's Purpose*

GSA Network alleges its purpose as "a youth-led nonprofit organization made up of gay, lesbian, bisexual, transgender and heterosexual students and supportive adults who are dedicated to eliminating homophobia and intolerance in schools." *See* Doc. 8, ¶ 7. "GSA Network primarily fights homophobia and intolerance in schools by empowering gay, lesbian, bisexual, transgender and heterosexual members in high schools to form and maintain local, school-based, student-run clubs, called 'GSAs,' in high schools throughout California." *See id.,* ¶ 8. The staff in the regional offices of GSA network connect these school- and community based GSAs to each other and to community resources in order to foster safe environments for student members; educate the student members and the school community about homophobia, gender identity, and sexual orientation issues; and fight intolerance, discrimination, harassment, and violence in schools. *See id.*

■ GSA Network's purpose is to end intolerance, discrimination, harassment, and violence in schools, directed at gay and lesbian students, and those perceived to be gay or lesbian. *See id.,* ¶¶ 7–8. The interests GSA Network seeks to protect are the rights of its members, other gay and lesbian students, and those perceived to be gay or lesbian, within the VUSD. *See id.* In addition, the GSA Network seeks to protect those students' safety, and to end the taunts, humiliation and discrimination by students, teachers, counselors and administrators within the VUSD. *See id.* The interests the GSA Network seeks to protect are germane to the organization's pur-

pose of fighting intolerance, homophobia, and discrimination against gay and lesbians in schools.

### 3. *Individual Member Participation*

■ The participation of individual members is not required when the claims proffered and relief requested do not demand individualized proof on the part of an association's members. *See Associated General Contractors of California, Inc.,* 950 F.2d at 1408; cf. *United Union of Roofers v. Insurance Corp. of America,* 919 F.2d 1398, 1400 (9th Cir.1990) (denying standing because individual Union members will have to participate at the proof of damages stage) with *Alaska Fish & Wildlife Fed'n v. Dunkle,* 829 F.2d 933, 938 (9th Cir.1987) (allowing standing because the organization sought declaratory and prospective relief rather than money damages; thus, its members need not participate directly in the litigation). Lack of actual or potential conflict among an association's members is not required to satisfy *Hunt*'s third prong. *See Coalition For Economic Equity,* 950 F.2d at 1408–1409.

■ In this case, GSA Network has asked only for declaratory and injunctive relief, no prayer for compensatory or punitive damages is asserted. *See* Doc. 8, 35:14–36:17. No money damages are requested by GSA Network; its members need not participate directly in the litigation. *See Alaska Fish & Wildlife Fed'n,* 829 F.2d at 938. GSA Network satisfies *Hunt*'s third prong.

### 4. *GSA Network Direct Standing*

■ Direct standing is shown where the defendants' practices have "perceptibly impaired" the organizational plaintiff's ability to provide the services it was formed to provide. *See Havens Realty Corporation v. Coleman,* 455 U.S. 363, 378–379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (petitioners' alleged practices found

to perceptibly impair plaintiff's ability to provide counseling and referral services for low- and moderate-income home seekers, with the consequent drain on the organization's resources); *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review,* 959 F.2d 742, 748 (9th Cir.1991) (standing found where defendant's alleged policies frustrate plaintiff's declared goals and require the organization to expend resources in representing members they otherwise would spend in other ways).

■ Here, GSA Network's purpose is to end intolerance, discrimination, harassment, and violence in schools, directed at member gay and lesbian students, and those perceived to be gay or lesbian. *See id.,* ¶¶ 7–8. Those goals are directly frustrated by Defendants' alleged policies of transferring gay or lesbian students, and ignoring complaints regarding the safety, harassment, and discrimination against gay and lesbian students, and those perceived to be gay or lesbian. The GSA Network has allegedly devoted significant monetary and staffing resources to address the problems of alleged discrimination, harassment, and homophobia in VUSD schools through its Fresno office. *See id.,* ¶ 10. GSA Network has suffered an injury in fact sufficient to confer direct standing; it has committed resources to advance goals which are thwarted by the alleged policies of the VUSD.

Defendants argue that before GSA Network can have direct standing, it must first form a club on a VUSD campus. *See* Doc. 24, 8:6–8. Defendants' proposed requirement is unsupported by the case law; Plaintiff's need only show that defendant's alleged polices frustrate the goals of the organization seeking standing. *See Havens Realty Corporation,* 455 U.S. at 378–379, 102 S.Ct. 1114; *El Rescate Legal Servs., Inc.,* 959 F.2d at 748. Defendants'

motion to dismiss Plaintiff, GAY–STRAIGHT ALLIANCE NETWORK, for lack of direct standing, is DENIED.

### C. State Law Claims; California Tort Claims Act

Defendants allege that Plaintiff Loomis' seventh and eighth causes of action should be "stricken and/or summarily adjudicated in favor of defendants" because Loomis did not present a government tort claim prior to filing his lawsuit. See Doc. 11 at 10.

Under the California Tort Claims Act (Cal. Gov't Code §§ 900 et seq.), no suit for money or damages may be brought against a pubic entity until a written claim has been presented to the public entity, and either has been acted upon or is deemed to have been rejected. See Alliance Financial v. City and County of San Francisco, 64 Cal.App.4th 635, 641, 75 Cal.Rptr.2d 341 (1998) citing Cal. Gov't Code §§ 905, 945.4. "[T]he purpose of the claims statutes 'is to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'" Phillips v. Desert Hospital District, 49 Cal.3d 699, 705, 263 Cal.Rptr. 119, 780 P.2d 349 (1989). "The act should not be applied to snare the unwary where its purpose has been satisfied, consequently courts employ a test of substantial rather than strict compliance in evaluating whether a plaintiff has met the demands of the claims act."[1] Elias v. San Bernardino County Flood Control District, 68 Cal. App.3d 70, 74, 135 Cal.Rptr. 621 (1977) (internal citations omitted), see also Phillips, 49 Cal.3d at 705, 263 Cal.Rptr. 119, 780 P.2d 349; Alliance Financial, 64 Cal. App.4th at 641, 75 Cal.Rptr.2d 341.

If a document does not substantially comply with section 910 but nonetheless "discloses the existence of a 'claim' which, if not satisfactorily resolved, will result in a lawsuit against the entity," such document constitutes a "claim as presented" or "defective claim" triggering the notice and defense waiver provisions of the Act, sections 910.8, 911, 911.3. See Phillips v. Desert Hospital District, 49 Cal.3d 699, 707–09, 263 Cal.Rptr. 119, 780 P.2d 349 (1989). "While falling short of placing an affirmative duty on public entities to obtain the information deemed necessary to investigate incidents and to determine whether settlement is appropriate," the notice and defense waiver provisions "furnish a strong incentive to do so by sanctioning a public entity that fails to ask the claimant for such information." See id. at 711, 263 Cal.Rptr. 119, 780 P.2d 349. "Thus if a public entity receives a document that alerts it to the existence of a claim and the possibility of a lawsuit but fails to comply substantially with sections 910 and 910.2, the purposes of the act are best served by requiring the public entity to notify the claimant of the nature of the claim's insufficiencies or lack of timeliness or else waive, by operation of sections 911 and 911.3, its defenses based on those deficiencies."

---

**1.** Note to OWW: Earlier cases, including Elias, held that one of the functions of the claims act was to apprise the governmental body of "imminent" legal action so that it could investigate and evaluate the claim and, where appropriate, avoid litigation by settling meritorious claims. See Elias, 68 Cal.App.3d at 74, 135 Cal.Rptr. 621. Defendants could assert that, because the January 11, 2000 letter indicated that Plaintiff would be filing a "Government Code Claim prior to filing a lawsuit," Defendants were not apprised that legal action was imminent. See Doc. 20, Ex. "A". 6 Alliance Financial, interpreting the California Supreme Court's decision in Phillips, held that it is unnecessary to notify the public entity that a lawsuit is "imminent," provided the communication notifies the public entity that a claim has accrued, and that the claimant intends to enforce it. See Alliance Financial, 64 Cal.App.4th at 647, 75 Cal.Rptr.2d 341.

### 1. *Substantial Compliance with Claims Act*

Under Government Code section 910, a claim must show (1) the "name and post office address of claimant," (2) the address to which notices are to be sent, (3) the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted," (4) a "general description of the indebtedness, obligation, injury, damage or loss incurred," (5) the "name or names of the public employee or employees causing the injury, damage or loss," and (6) the amount claimed if it totals less than $10,000; if the amount claimed exceeds ten thousand dollars ($10,000), no dollar amount shall be included in the claim. "However, it shall indicate whether the claim would be a limited civil case." Cal. Gov't.Code § 910.

"When a public entity receives a document which contains the information required by section 910 and is signed by the claimant or [his] agent as required by section 910.2, the public entity has been presented with a 'claim' under the act, and must act within 45 days or the claim is deemed to have been denied. (§ 912.4) Once a claim is denied or deemed to have been denied, the claimant may then proceed to file a lawsuit." *Phillips*, 49 Cal.3d at 707, 263 Cal.Rptr. 119, 780 P.2d 349.

All six Section 910 claim requirements are addressed in a January 11, 2000 letter entitled "Notification of Discrimination of Student George S. Loomis," mailed to Robert Cesena, the Principal of Golden West High School with a copy to Linda Gonzalez, Superintendent, Visalia Unified School District. *See* Doc. 20, Ex. "A". (1) The letter identifies Plaintiff George Loomis as senior year student previously enrolled at Visalia Unified's Golden West High School. It also provides the address of his attorney. A statement of the address of claimant's counsel substantially complies with the requirement that claim-ant's address be given. *See Cameron v. City of Gilroy*, 104 Cal.App.2d 76, 230 P.2d 838 (1951). (2) The letter requests any response be directed to the attorney's office. (3) The letter identifies several circumstances giving rise to Loomis' claim including a September, 1999 incident in which Loomis' Spanish II teacher, Mr. Garcia, told the following "joke," allegedly directed at Loomis,: "There are 2 kinds of guys who wear earrings. Pirates and faggots, and there is no water around here." A second incident described in the notification letter concerned the remark, "He's a faggot." allegedly made by Ms. Sarah Kharmam, Golden West High School Counselor, and overheard at Loomis' place of employment in November, 1999. (4) The letter provides a general description of injury as a "lost right to attend regular classes, falling behind in his class work and his college career has been potentially disrupted." It describes the alleged indebtedness or damage as "medical, counseling, and legal fees necessitated by the actions of District employees." (5) Mr. Garcia, Ms. Kharam, and Mr. Stephens, Golden West's Vice Principal, were identified as public employees causing injury to Mr. Loomis. (6) Plaintiff indicates that the amount of the claim exceeds $10,000. *See* Doc. 18 at 17. Thus, no dollar amount needed to be included in the claim. *See* Cal. Gov't.Code § 910(f).

While the letter does not expressly state whether the claim "would be a limited civil case," it does provide sufficient information to indicate that it will not be. California Code of Civil Procedure (C.C.P.) § 580(b) provides that a permanent injunction is a type of "relief that may not be granted in a limited civil case." *See* Cal. Code Civ. Proc. § 580. Loomis' claim letter demanded reinstatement to a suitable independent study program to allow completion of high school graduation requirements. If granted, this relief would be in

the form of a permanent injunction. *See* Doc. 20, Ex. "A" at 3. Plaintiff's letter provided sufficient information to establish that Plaintiff's claim would not qualify as a limited civil case. *See Ridge v. Boulder Creek High Sch. Dist.*, 60 Cal.App.2d 453, 140 P.2d 990 (1943) (claimant substantially complied where sufficient information was supplied to ascertain required information with modest effort.)

The January 11, 2001 letter provides all of the information required under section 910, Plaintiff has substantially complied with the claims requirement of the California Tort Claims Act.

Defendants do not dispute that the contents of the letter substantially complied with the requirements of Section 910. Rather, they argue alternatively that (a) because the Plaintiff did not intend the letter to be a "claim," no tort claim was filed; (b) Plaintiff failed to affirmatively allege compliance with the claims presentation requirement; and (c) Plaintiff failed to allege facts showing the applicability of a recognized exception or excuse for non-compliance. *See* Doc. 11 at 9.

a. *Plaintiff's Government Tort Claim*

Defendants maintain that Plaintiff Loomis never filed a tort claim. Defendants argue that the January 11, 2000 letter threatening to file a government tort claim[2] cannot constitute substantial compliance with the claim presentment requirement because "by his own admission" Plaintiff's former attorney did not intend

the letter to be a government tort claim. *See* Doc. 24 at 10. However, Plaintiff's subjective intent is irrelevant. *See Phillips*, 49 Cal.3d at 709–10, 263 Cal.Rptr. 119, 780 P.2d 349.

In *Phillips*, Plaintiff's attorney sent a notice of intention to commence an action based on a health care provider's alleged professional negligence under C.C.P. § 364 to a public hospital. The hospital argued that plaintiffs could never have intended their 364 notice to function as a claim for purposes of the act because, by plaintiffs' own admission, they were not aware of the hospital's status as a public entity. *See id.* at 709, 263 Cal.Rptr. 119, 780 P.2d 349. The Supreme Court held:

> Implementation of the purposes of the claim presentation requirements—to require public entities to manage and control claims and to encourage timely investigation and settlement to avoid needless litigation—depends not on a claimant's state of mind but rather on the information imparted to the public entity. Thus the relevant inquiry is not into plaintiffs' subjective intent but whether their 364 notice disclosed to the hospital that they had a claim against it which, if not satisfactorily resolved, would result in their filing a lawsuit. *See id.*[3]

*Phillips* was unconcerned with the possibility that an "improperly captioned document could have an unintended legal effect" stating, "it is settled that the caption

2. Plaintiff's January 11 letter states: "Along with this notification to you, my client has instructed me to initiate the following additional steps: ... Prepare and file a Government Code Claim prior to filing a lawsuit." Defendants argue the only possible interpretation of this statement is that the present letter demand is not a government tort claim.

3. Because it did not state the amount sought in damages as required by the applicable version of section 910, Plaintiff's 364 notice did not substantially comply with section 910. *See Phillips*, 49 Cal.3d at 708, n. 7, 263 Cal. Rptr. 119, 780 P.2d 349. However, the hospital was required to treat Plaintiff's defective claim as a "claim as presented" triggering the notice and defense-waiver provisions of sections 910.8, 911 and 911.3 because the notice alerted the hospital to the existence of a claim and the possibility of a lawsuit. *See id.* at 711, 263 Cal.Rptr. 119, 780 P.2d 349.

or title of a notice does not diminish its legal effect as a claim." *See id.* at 710–711, 263 Cal.Rptr. 119, 780 P.2d 349. The Supreme Court apparently reasoned that, as long as the 364 notice apprised the hospital of the claim and possibility of a lawsuit, the purposes of the claim requirement were satisfied, and the hospital could not be prejudiced by Plaintiff's failure to identify the notice as a government tort claim. *See id.* The hospital was on notice of the claim, could investigate, and respond, as contemplated by the policy of the tort claims statute.

In *Wheeler v. County of San Bernardino,* the court similarly held that if the "requisite information is in fact given, it is not essential that it be given with the intention of complying with the claims statute." *Wheeler v. County of San Bernardino,* 76 Cal.App.3d 841, 847, 143 Cal. Rptr. 295 (1978). The plaintiff in *Wheeler* petitioned the county for leave to file a late claim. *See id.* at 845, 143 Cal.Rptr. 295. Attached to the petition were a proposed claim, and declarations attempting to justify failure to file the claim within the statutory time frame. *See id.* Although the county treated these documents as a petition to file a late claim, rather than a claim, the Appeals Court found they were "sufficient to put the county on notice of plaintiff's intentions and contentions," and held that Wheeler satisfied the claim presentation requirements. *See id.* at 847, 143 Cal.Rptr. 295.

Under *Phillips* and *Wheeler,* Plaintiff's January 11, 2000 letter satisfies the claim presentment requirement of the Act. The letter, entitled "Notification of Discrimination of Student George S. Loomis," was not intended by Plaintiff's attorney to be a "government tort claim." However, the letter alerted the district to the existence of a claim and the possibility of a lawsuit.

The District was well aware Mr. Loomis was presenting a claim and its response to Plaintiffs allegations in its letter dated January 26, 2000, demonstrate it denied (rejected) the claim. *See* Doc. 12, Ex. "C". "[A]fter an investigation of the issues involved," the District asserted that Ms. Karam's remarks were not directed at Mr. Loomis. *See id.* The District confirmed that Mr. Garcia made the statement reported in Plaintiff's letter. *See id.* Based on its investigation, the District characterized the complained of behavior as: "allegedly whispering to a friend that another person might be gay and/or … telling a sexually offensive joke in a classroom setting." *See id.* The District determined it was not appropriate to settle the claims, because by its "reading of the law," this conduct did "not constitute an actionable tort." *See id.* The District concluded that it would "not be offering to pay Mr. Loomis' medical or counseling expenses, nor his legal fees." *See id.* Exalting substance over form compels the conclusion that the District treated the plaintiff's demand letter as a claim and denied it. This benefitted defendant by shortening the limitations period to file a complaint in court.

Plaintiff's January 11, 2000 letter satisfies the purpose of the claims statute by providing the District with sufficient information to investigate Loomis' claims, and determine whether settlement was appropriate. *See Phillips,* 49 Cal.3d at 705, 263 Cal.Rptr. 119, 780 P.2d 349. The information provided in the letter substantially complied with the requirements of section 910 to enable the District to determine it would not settle Mr. Loomis' claims and to reject any settlement of his demands. Plaintiff's intent in submitting the letter is irrelevant. *See id.* at 709, 263 Cal.Rptr. 119, 780 P.2d 349; *Wheeler,* 76 Cal.App.3d at 847, 143 Cal.Rptr. 295. Defendant's failure to "interpret" Plaintiff's letter as a claim because it was not labeled a claim

does not diminish its effectiveness. The letter was "sufficient to put the [District] on notice of plaintiff's intentions and contentions." *Wheeler*, 76 Cal.App.3d at 847, 143 Cal.Rptr. 295. Plaintiff's Letter constitutes a "claim" presented to Visalia Unified School District, which the District rejected, for purposes of the California Tort Claims Act.

Defendants were afforded additional time to submit legal authorities following oral argument. They did not do so.

b. *Affirmative Allegation of Compliance with Claims Presentation Requirement*

Defendants maintain that Plaintiffs do not affirmatively allege compliance with the claims-presentation requirement or facts showing the applicability of a recognized exception or excuse for noncompliance. *See* Doc. 11 at 9. *citing C.A. Magistretti Co. v. Merced Irrig. Dist.*, 27 Cal. App.3d 270, 103 Cal.Rptr. 555 (1972).

The First Amended Complaint states "Plaintiff, George Loomis provided notice of his claims to VUSD in January, 2000." *See* Doc. 8 at 5. This notice refers to the January 11 letter which fulfilled the Tort Claims Act's claim requirements. Because Plaintiffs alleged provision of notice, and the notice constituted a claim under the Act, Plaintiffs affirmatively alleged compliance with the claims-presentation requirements.

c. *Exemption or Excuse for Non-compliance*

Plaintiffs also allege, in the alternative, exemption from the claims requirements because Defendants failed to comply substantially with Sections 946.4 and 53051 of the California Government Code. *See* Doc. 8 at 5, Doc. 18 at 19. Under section 946.4, failure to present a timely claim to a public agency is not a bar to an action if the agency failed to make a timely filing of the

information statement required by section 53051. *See* Cal. Gov't.Code §§ 946.4, 53051.

Judicial notice is taken that Visalia Unified has filed information statements with both the County of Tulare and State of California. *See* Doc. 12, Ex. "A"; Doc. 14, Ex. "B". Plaintiff's maintain that there were changes in the composition of the Board and Superintendent that were not reflected in these statements at the time of Plaintiff's claim or 70 days thereafter. They further maintain that summary judgment is inappropriate because Plaintiffs have not been afforded an opportunity to conduct discovery as to the District's substantial compliance with this registration requirement.

It is unnecessary to resolve this issue. Because Plaintiff Loomis substantially complied with the claims presentation requirement, Plaintiff need not establish an exemption therefrom. Defendants' motion to dismiss for failure to state a claim, Plaintiff, GEORGE LOOMIS', Seventh and Eighth causes of action is DENIED. Defendants' motion to strike and summarily adjudicate Plaintiff, GEORGE LOOMIS', Seventh and Eighth causes of action is DENIED.

D. *Punitive Damages*

 Under Section 1983, punitive damages are proper "either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *Davis v. Mason County*, 927 F.2d 1473, 1485 (9th Cir.1991) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). For state civil rights claims, the standard for punitive damages is the same for claims brought under Section 1983. *See Smith*, 461 U.S. at 48–49, 103 S.Ct. 1625. A public entity cannot be sued under Section

1983 as a matter of law for punitive damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Ruvalcaba v. City of Los Angeles,* 167 F.3d 514, 523 (9th Cir. 1999).

### 1. *VISALIA UNIFIED SCHOOL DISTRICT*

■ Defendant, VUSD, is a public entity. *See id.,* ¶ 14. VUSD cannot be sued for punitive damages under Section 1983. Plaintiffs' prayer for punitive damages against Defendant, VISALIA UNIFIED SCHOOL DISTRICT, under Section 1983 is STRICKEN.

Mr. Loomis' Seventh state law claim is also against the VUSD for violation of California Education Code sections 200, 220, 233.5, and 262.4. *See id.,* 32:10–12. The "Enforcement" provision states in relevant part:

> "Persons who have filed a complaint, pursuant to this chapter, with an educational institution shall be advised by the educational institution that civil law remedies, including, but not limited to, injunctions, restraining orders, or other remedies or orders may also be available to complainants."

■ Cal. Edu.Code § 262.3(b). Because the enforcement provision does not limit the type of remedies allowed to a complainant, pursuant to California Government Code section 818, public entities such as Defendant, VISALIA UNIFIED SCHOOL DISTRICT, are immune from exposure to punitive damages from State law claims. Plaintiffs at oral argument have expressed their intent not to seek punitive damages from the VISALIA UNIFIED SCHOOL DISTRICT. Defendants' motion to dismiss Plaintiff, GEORGE LOOMIS', prayer for punitive damages against Defendant, VISALIA UNIFIED SCHOOL DISTRICT, is GRANTED.

### 2. *LINDA GONZALES*

Here, Plaintiff alleges that between October and December 1999, Mr. Loomis attempted to contact, then-VUSD Superintendent, Defendant, LINDA GONZALES, to discuss the constant harassment Mr. Loomis was receiving. *See* Doc. 8, ¶ 45. Ms. Gonzales did not return any of Mr. Loomis' phone calls. *See id.* In December 1999, Mr. Loomis went to Ms. Gonzales' office but was informed she was not in that afternoon. *See id.* Mr. Loomis related to Ms. Gonzales' assistant the conditions of harassment he was facing at Golden West. *See id.* Ms. Gonzales' assistant promised to pass these notes to Ms. Gonzales. *See id.* Mr. Loomis has not received a response from Ms. Gonzales. *See id.* Ms. Gonzales is sued under Section 1983 and the Unruh Civil Rights Act. *See* Doc. 8, 35:13–36:25.

It appears unclear whether defendant's conduct was driven by evil motive or intent, or involved a reckless or callous indifference to Plaintiff's constitutional rights. Defendants' motion to strike Plaintiff, GEORGE LOOMIS', prayer for punitive damages against Defendant, LINDA GONZALES, DENIED.

■ Plaintiffs' claim for punitive damages against defendant, Gonzales, is sufficiently specific to give her notice of the basis for which punitive damages are sought; i.e., reckless disregard of state required duties resulting in violation of plaintiff's constitutional rights or malice in ignoring plaintiff's efforts to seek her intervention in redressing his claims.

Plaintiffs' punitive damage claim is not immaterial, impertinent, or irrelevant to the claims alleged, Defendants' motion to strike Plaintiffs' punitive damage claim against Defendant, LINDA GONZALES, is DENIED.

**1112**

## V. *CONCLUSION*

For the reasons stated above:

1. Defendants' request for judicial notice of certified copies of official records maintained by the Tulare County Recorder's office and the California Secretary of State showing the registration of the VISALIA UNIFIED SCHOOL DISTRICT with the Roster of Public Agencies, is GRANTED.

2. GSA Network has made a sufficient showing for associational standing; Defendants' motion to dismiss for failure to state a claim is DENIED.

3. Defendants' motion to dismiss Plaintiff, GAY–STRAIGHT ALLIANCE NETWORK, for lack of direct standing, is DENIED.

4. Defendants' motion to dismiss for failure to state a claim, Plaintiff, GEORGE LOOMIS', Seventh and Eighth state law claims is DENIED.

5. Defendants' motion to strike and summarily adjudicate Plaintiff, GEORGE LOOMIS', Seventh and Eighth state law claims is DENIED.

6. GSA Network's prayer for punitive damages against Defendant, VISALIA UNIFIED SCHOOL DISTRICT, under Section 1983 is STRICKEN.

7. Defendants' motion to strike Plaintiff, GEORGE LOOMIS', prayer for punitive damages against Defendant, LINDA GONZALES, is DENIED.

8. Plaintiffs' claim for punitive damages against Ms. Gonzalez is not so indefinite that the defendants cannot ascertain the nature of the claim being asserted. Plaintiffs' punitive damage claim is not immaterial, impertinent, or irrelevant to the claims alleged. Defendants' motion to dismiss Plaintiffs' punitive damage claim against Defendant, LINDA GONZALES, is DENIED.

SO ORDERED.